**FIRST BANK CENTRE, Appellant,**

v.

**Ronald R. THOMPSON, et al., Respondents.**

**No. 19727.**

Missouri Court of Appeals, Southern District, Division Two.

Aug. 3, 1995.

Motion for Rehearing or Transfer to Supreme Court Denied Aug. 25, 1995.

Application to Transfer Denied Oct. 24, 1995.

Mark D. Pasewark, Virginia G. Pasewark, St. Louis, Faye M. Coultas, Osage Beach, for appellant.

Gregory D. Williams, Sunrise Beach, for respondents Ronald Thompson and Janice Thompson.

Terry A. Bond, Vines, Frankel, Rubin, Bond & Dubin, P.C., Clayton, for respondents Bernard Beggan and Patricia Beggan.

No appearance for other respondents.

CROW, Judge.

This action arose from two loans by Plaintiff, First Bank Centre, to Sylvan Bay Golf & Country Club, Inc. ("SBG & CC"). Plaintiff alleged the first loan was guaranteed by eight individuals: Ronald Thompson and Janice Thompson, Carter Wrinkle and Joan Wrinkle, Michael French and Bobette French, John Vogel and Yvonne Vogel. Plaintiff alleged the second loan was guaranteed by the same eight individuals plus two others: Bernard Beggan and Patricia Beggan.

In the trial court, Plaintiff sought to recover (a) the principal amount of the first loan, plus interest from January 1, 1990, from the Thompsons, the Wrinkles, the Frenchs and the Vogels, and (b) the principal amount of the second loan, plus interest from December 16, 1989, from those eight individuals plus the Beggans.[1]

The case went to trial before a jury. At the close of Plaintiff's evidence, the trial court directed a verdict against Plaintiff and in favor of all ten defendants.

Plaintiff appeals. The first of its six points relied on reads:

"The trial court erred in granting a directed verdict for Appellees [sic], because Bank proved a prima facia [sic] case on a guaranty and the matter should have been submitted to the jury."

Rule 84.04(d)[2] reads, in pertinent part:

"The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous...."

The purpose of the rule and the necessity of obeying it are fully discussed in the vener-

---

1. Plaintiff's first amended petition, upon which the case went to trial, alleged SBG & CC's "corporate rights were forfeited" subsequent to the loans. Counts I and II sought recovery from the statutory trustees of SBG & CC. *See:* § 351.525, RSMo Cum.Supp.1990 (repealed by S.C.S.H.B. No. 219, Laws of Missouri 1991, pp. 845–46). Plaintiff dismissed Counts I and II without prejudice immediately before trial.

2. Rule references are to Missouri Rules of Civil Procedure (1995).

able case of *Thummel v. King,* 570 S.W.2d 679, 684–88 (Mo. banc 1978).

■ Plaintiff's first point supplies no hint as to wherein and why Plaintiff's evidence made a prima facie case on the guaranties. Consequently, the point presents nothing for appellate review. *Mannon v. Frick,* 365 Mo. 1203, 295 S.W.2d 158, 166[15, 16] (1956); *Aley v. Hacienda Farms, Inc.,* 584 S.W.2d 126, 127–28[1] (Mo.App.S.D.1979).

■ However, because of the amount in dispute, we shall examine the argument following the first point to determine whether the directed verdict was plain error within the meaning of Rule 84.13(c). *In re Marriage of McCoy,* 818 S.W.2d 322, 325[3] (Mo. App.S.D.1991). That rule authorizes an appellate court, in its discretion, to consider plain errors affecting substantial rights, though not raised or preserved, when the court finds manifest injustice or miscarriage of justice has resulted therefrom. *Brown v. Mercantile Bank of Poplar Bluff,* 820 S.W.2d 327, 335[7] (Mo.App.S.D.1991). We are mindful that the plain error doctrine is rarely resorted to in civil cases. *Id.*

The saga began June 29, 1988, when SBG & CC, acting through its officers, signed a document identified at trial as Plaintiff's Exhibit 12. The parties refer to it as a note, hence we denominate it "the first note."

The principal amount of the first note is $219,000; however, the first note shows a "Loan Amount" of $216,810.[3] The first note includes the following provisions, among others:

"Multiple Advance: The principal sum shown above is the maximum amount of principal I can borrow under this note. As of today I have received the amount of $0.00 and future principal advances are contemplated.

Purpose: The purpose of this loan is construction.

Variable Rate: I agree to pay interest at the initial simple rate of 11.250% per year. This rate may change as stated below.

Index Rate: The future rate will be 125% of the following index rate: Wall Street Journal Prime.

Frequency and Timing: The rate on this note may increase as often as Daily. An increase in the index will take effect Immediately."

The first note provides that accrued interest shall be paid on demand but, if no demand be made, monthly beginning July 30, 1988. Principal is to be paid on demand but, if no demand be made, on June 30, 1990. The first note also provides: "If you must hire a lawyer to collect this note, I must pay his or her fee, plus court costs...."

Defendant John Vogel, once secretary of SBG & CC, testified the purpose of the loan was to finance construction of nine holes of a proposed eighteen-hole golf course on 131 acres owed by SBG & CC. SBG & CC gave Plaintiff a deed of trust on the tract to secure payment of the first note.

Evidence presented by Plaintiff and received by the trial court included a document denominated "Guaranty" signed by defendants Vogel. Among its provisions was this:

"[T]he undersigned guarantee(s) to [Plaintiff] the payment and performance of the debt, liability or obligation of [SBG & CC] to [Plaintiff] evidenced by or arising out of the following: Loan dated June 29, 1988, maturing June 30, 1990...."

The trial court received in evidence identical documents signed by defendants Thompson, Wrinkle and French.

Defendant John Vogel recounted that SBG & CC received no money from Plaintiff on the date the first note was signed. He explained, "[W]e were set up with an escrow draw." Then, this:

"Q ... Do you have a specific recollection today of receiving $219,000 from First Bank Centre?

---

**3.** We deduce this is because the first note shows: "1% Loan Origination Fee at time of closing." One percent of $219,000 is $2,190. Deducting the latter amount from $219,000 leaves $216,-810.

A I'm sure we received it.

Q Well, I'm asking you, do you specifically recall receiving that total amount of money?

A It would have been drawn over a number of draws, and I'd have to have a calculator and those draws in front of me to determine that, but I don't know why we would not have received 219,-000. But I don't have a specific recollection of that, no.

Q So you can't tell the jury here today that you absolutely certainly received that amount of money; is that correct?

A That's correct."

Defendant John Vogel further testified that in the fall of 1988, SBG & CC's board of directors determined there was insufficient money to complete the golf course, so SBG & CC asked Plaintiff for a second loan.

On March 17, 1989, SBG & CC, by its president, defendant Carter Wrinkle, and secretary Vogel, signed a document identified at trial as Plaintiff's Exhibit 31. The parties refer to it as a note, hence we denominate it "the second note."

The principal amount of the second note is $65,000. It contains a "Multiple Advance" provision identical to the first note. The purpose of the loan, as shown on the second note, is: "Completion of Golf Course." The second note further provides:

"Variable Rate: I agree to pay interest at the initial simple rate of 14.375 (125% of Prime) % per year. This rate may change as stated below."

The second note has an "Index Rate" provision and a "Frequency and Timing" provision identical to the first note. Accrued interest shall be paid on demand but, if no demand be made, quarterly beginning July 15, 1989. Principal is to be paid on demand but, if no demand be made, on June 15, 1990. The second note also has a provision for attorney fees identical to the first note.

Simultaneously with the second note, SBG & CC gave Plaintiff a "Second Deed of Trust" on the tract covered by the deed of trust securing the first note.[4]

Evidence presented by Plaintiff and received by the trial court included four documents, each denominated "Guaranty," signed respectively by defendants Vogel, defendants Wrinkle, defendants French and defendants Beggan. Each "Guaranty" provides, *inter alia:*

"[T]he undersigned guarantee(s) to [Plaintiff] the payment and performance of the debt, liability or obligation of [SBG & CC] to [Plaintiff] evidenced by or arising out of the following: Loan dated March 17, 1989, maturing June 15, 1990...."

Plaintiff offered in evidence a similar "Guaranty" signed by defendants Thompson, but the trial court rejected it. That ruling is the subject of Plaintiff's third point, addressed *infra.*

Although the evidence is vague, it is inferable SBG & CC failed to pay the principal amount of either the first note or the second note when due. Consequently, Plaintiff foreclosed the initial deed of trust. We deduce from the record that the sale occurred October 17, 1990. Defendant Michael French bid the highest sum, $76,000, and the trustee sold the tract to him.

The reverse side of the first note shows that after deducting sundry expenses attributed to the sale, $73,574 remained as "net proceeds." Said amount is entered in a column headed "Principal Payments." It is the only entry in that column.

In directing the verdict against Plaintiff, the trial court found Plaintiff's proof deficient in several respects, including: (1) failure to show the amounts disbursed by Plaintiff to SBG & CC, (2) failure to establish the interest rate in either note, and (3) failure to present evidence as to "collection fees/attorney fees."

---

4. The "Second Deed of Trust" was apparently meant to secure the second note. However, said deed of trust refers to a note for $219,000, not a note for $65,000. This anomaly is unexplained in the briefs.

In determining whether Plaintiff's evidence made a submissible case, we view the evidence in a light most favorable to Plaintiff, giving it the benefit of all inferences which may be reasonably drawn from the evidence in support of its cause of action. *Smith v. Allied Supermarkets, Inc.*, 524 S.W.2d 848, 849[1] (Mo. banc 1975). The evidence and inferences must establish every element of the cause of action and not leave any issue to speculation. *Southwestern Bell Telephone Co. v. Buie*, 758 S.W.2d 157, 164 (Mo.App.E.D.1988); *Lewis v. Renner*, 676 S.W.2d 909, 911[4] (Mo.App.E.D.1984); *Meyers v. City of Louisiana*, 637 S.W.2d 219, 221[2] (Mo.App.E.D.1982).

Plaintiff cites *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 382[22] (Mo. banc 1993), which holds:

> "To recover on a contract of guaranty, the creditor must show (1) that the defendant executed the guaranty, (2) that the defendant unconditionally delivered the guaranty to the creditor, (3) that the creditor, in reliance on the guaranty, thereafter extended credit to the debtor, and (4) that there is currently due and owing some sum of money from the debtor to the creditor that the guaranty purports to cover."

The trial court's conclusion that the evidence failed to show the amounts disbursed by Plaintiff to SBG & CC is pertinent to elements 3 and 4. The court's conclusion that the evidence failed to establish the interest rate in either note is pertinent to element 4.

Plaintiff insists the trial court overlooked testimony by defendant John Vogel. As reported earlier, he avowed he was sure SBG & CC received $219,000 on the first loan, although he had no specific recollection of any of the "draws." He also testified that to the best of his knowledge, SBG & CC received $65,000 on the second loan.

Assuming, without deciding, that the testimony in the preceding paragraph, viewed favorably to Plaintiff, is sufficient to support a finding that SBG & CC received, piecemeal, the full amount of both notes, it does not establish the amount SBG & CC owed Plaintiff at time of trial.

As we have seen, the initial interest rate of the first note differed from the initial interest rate of the second note. Each had a variable rate which could change daily. The future rate of each was 125 percent of "Wall Street Journal Prime."

Each note provided that each payment would first reduce any amount owed by SBG & CC for "charges which are neither interest nor principal." The remainder of each payment would then reduce "unpaid earned interest, and then unpaid principal." Each note further provided that each advance of principal would start earning interest only when received by SBG & CC. Finally, each note provided that the interest rate in effect "at any given time will apply to the entire principal advanced at that time."

It is thus evident that proving the amount of interest owed by SBG & CC on each note at time of trial required a series of calculations based upon (1) the date and amount of each disbursal of principal, (2) the interest rate in effect on each of those dates (which hinged on "Wall Street Journal Prime," whatever that was), (3) the interest rate in effect on each date thereafter, and (4) the date and amount of each interest payment made by SBG & CC before its demise.[5] In that regard, defendant Carter Wrinkle testified SBG & CC paid interest until "we were notified of the foreclosure." Plaintiff's brief does not reveal the date of the notice and yields no clue as to where (if anyplace) the date appears in the voluminous record. Wrinkle did not disclose the amount of interest paid by SBG & CC.

One of the exhibits received in evidence is a letter from Plaintiff to the Wrinkles dated February 14, 1990, demanding payment by them as guarantors of the first note. The letter states $223,080.69 is due, and $76.05

---

5. Footnote 1, *supra*.

Peel off the paragraph below and affix it over the
third full paragraph in the left-hand column on page
855 of volume 906 S.W. 2d.

As to the second note, one of the exhibits
received in evidence at trial and filed with us
is a letter from Plaintiff's lawyer to the Beg-
gans dated June 15, 1990, demanding pay-
ment by them as guarantors of the second
note. The letter states $69,114.41 is due, and
"$22.56944" interest is accruing each day.
How that precise amount of interest could
accrue daily when the interest rate could
change daily is unexplained.

interest is accruing each day. How that precise amount of interest could accrue daily when the interest rate could change daily is unexplained.

Furthermore, trial occurred four years after that letter. During that interval, the foreclosure sale occurred. It will be recalled that the reverse side of the first note shows the amount received by Plaintiff from the sale ($73,574) was applied against principal, which appears contrary to the provision in the first note that payments shall be applied to unpaid interest before unpaid principal.

Compounding the confusion, Plaintiff prayed for the full principal amount of the first note, which is inconsistent with applying the $73,574 foreclosure proceeds to principal.

As to the second note, one of the exhibits received in evidence at trial and filed with us is a letter from Plaintiff's lawyer to the Beggans dated June 15, 1990, demanding payment by them as guarantors of the second note. The letter states $69,114.41 is due, and "$22,569.44" interest is accruing each day. How that precise amount of interest could accrue daily when the interest rate could change daily is unexplained.

Plaintiff's evidence solved none of the above mysteries. Plaintiff did present seven letters from SBG & CC to Plaintiff requesting transfer of funds "from the loan proceeds" to SBG & CC's checking account. All seven requests were made before SBG & CC signed the second note. The earliest request was July 6, 1988; the latest, October 12, 1988. The requests total $196,823.15. However, there was no evidence that the amounts requested were placed in SBG & CC's checking account on the dates of the requests. Defendant Ronald Thompson testified SBG & CC had to wait "a few days" for transfers of funds.

As to the second note, Plaintiff presented evidence of requests from SBG & CC for disbursals totaling $64,977. Defendant John Vogel testified some of the proceeds from both loans were used to pay interest on both notes. Whether those interest payments were the ones referred to by defendant Carter Wrinkle is consigned to speculation.

In short, even assuming—without deciding—that the evidence, viewed favorably to Plaintiff, is sufficient to support a finding that SBG & CC received the full amount of both notes, it is obvious that the evidence failed to show how much principal was owed on the first note at time of trial. That is because of the question as to how the foreclosure sale proceeds should have been credited. Additionally, the evidence failed to show how much interest was owed on either note at time of trial.

Consequently, when Plaintiff rested its case the jury had no evidence from which it could determine the amount due Plaintiff from defendants Thompson, Wrinkle, French and Vogel on their guaranties of the first note. Similarly, the jury had no evidence from which it could determine the amount due Plaintiff from any defendant liable as a guarantor on the second note.[6]

Generally, damages need not be established with absolute certainty, but reasonable certainty is required as to both existence and amount, and the evidence must not leave the matter to speculation. *Aluminum Products Enterprises, Inc. v. Fuhrmann Tooling and Manufacturing Co.,* 758 S.W.2d 119, 121[1] (Mo.App.E.D.1988); *Haggard v. Mid–States Metal Lines, Inc.,* 591 S.W.2d 71, 77[9, 10] (Mo.App.W.D.1979). In *Zoglin v. Layland,* 328 S.W.2d 718 (Mo.App.1959), a suit on a guaranty, the appellate court held the trial court did not err in refusing to award the plaintiff damages where the evidence was so indefinite that the damages were incapable of ascertainment. *Id.* at 724[10].

---

**6.** As noted earlier, the trial court refused to receive in evidence the "Guaranty" signed by defendants Thompson on the second note. That ruling is the subject of Plaintiff's third point, *infra.* Defendants Beggan asserted in the trial court, and argue here, that they are not liable as guarantors on the second note for various reasons. As shall become apparent *infra,* we need not decide whether any of those reasons are valid.

Here, the amount of principal due on the first note at time of trial hinged on whether the $73,574 foreclosure proceeds should have been credited entirely against principal or whether they should have been credited against unpaid interest, with the balance of the proceeds (if any) credited against principal. While it appears Plaintiff credited all the foreclosure proceeds against principal, the first note appears to require otherwise.

Obviously, the amount credited against principal would affect the amount of interest owed on the first note at time of trial. Applying all the foreclosure proceeds against principal would reduce the amount of principal on which interest accrued thereafter. Applying the foreclosure proceeds against unpaid interest would lessen the amount available to reduce principal, thereby leaving more principal on which interest would thereafter accrue.

Furthermore, the interest rate on each note on any particular date could not be determined without knowing the "Wall Street Journal Prime" rate on such date and multiplying it by 1.25. Plaintiff presented no evidence about "Wall Street Journal Prime." When the trial court pointed this out, Plaintiff's lawyer[7] replied:

"If we can't produce evidence, and obviously we can't, as to what the interest rate is or the payments, then we can't ask for interest. I don't question that."

Plaintiff presented several witnesses; however, only one was its employee—its president, Steve Schmidt. Neither Schmidt nor any other witness testified as to the aggregate amount of principal and interest due Plaintiff on either note at time of trial. Absent that information, it was impossible to know how much was due Plaintiff from any guarantor on either note.

That gap in the proof left the fourth element of Plaintiff's claims on the guaranties without evidentiary support. As explained in *ITT Commercial Finance Corp.*, 854 S.W.2d at 382[22], the fourth element of a claim on a guaranty is that there is some sum of money due from the debtor to the creditor that the guaranty purports to cover. We do not understand the phrase "some sum of money," as used in that case, to mean some undetermined amount, but rather to mean a specific sum established by the evidence. We reach this conclusion because the claimant on the guaranty in that case proved the specific sums owed by the debtor to the creditor. 854 S.W.2d at 375. That is consistent with the rule that in a suit on a promissory note, a claimant makes a prima facie case against the maker by producing the note signed by the maker and showing the balance due. *Curt Ogden Equipment Co. v. Murphy Leasing Company, Inc.*, 895 S.W.2d 604, 608[4] (Mo.App.E.D.1995); *Green Acres Enterprises, Inc. v. Freeman*, 876 S.W.2d 636, 640[15] (Mo.App.W.D.1994).

Assuming, arguendo, that the evidence, viewed favorably to Plaintiff, was sufficient to support a finding that SBG & CC owed Plaintiff some undetermined amount on each note at time of trial, there was no evidence from which a fact finder could determine the sum due on either note. Consequently, any sum awarded Plaintiff against any defendant would have been based on sheer speculation. Damages that are entirely speculative cannot be allowed. *Burch v. Union Life Insurance Co.*, 319 S.W.2d 908, 911[3] (Mo.App.1959).

As observed earlier, the trial court also ruled Plaintiff failed to present evidence regarding attorney fees. Plaintiff says the trial court was wrong because "the trial court is an expert on attorney's fees and may determine an appropriate amount."

The four cases cited by Plaintiff in support of its position are factually dissimilar to the instant case. In two of the cited cases the party seeking attorney fees presented evidence on the issue. Another of the cited cases was an interpleader action tried by the

---

**7.** The lawyer who represented Plaintiff at trial is not among the lawyers representing Plaintiff on appeal.

court, which was able to determine much of the work done by counsel. In the final cited case the note sued upon provided for an attorney fee based on a percentage of the note.

■ Here, neither note provided for an attorney fee based on a percentage of the sum due (whatever it was), and Plaintiff presented no evidence in regard to the services performed by its lawyer. Consequently, any amount awarded for attorney fees would have been based on guesswork.

■ Having carefully considered the deficiencies in the evidence, we hold no manifest injustice or miscarriage of justice occurred when the trial court entered the directed verdict. The suit had been pending more than three and a half years when it went to trial, hence Plaintiff had ample time to ascertain what had to be proved and assemble the requisite evidence. Having chosen to charge a variable interest rate, it was incumbent on Plaintiff to produce the proof necessary to show the amounts owed. Why Plaintiff was unable to present business records showing the dates and amounts of the disbursals of principal, the dates and amounts of payments by SBG & CC, and the interest owed on each note at the time of each payment is unexplained. While such proof would have been tedious, it should not have been overly difficult.

We therefore conclude Plaintiff's first point, reviewed for plain error only, supplies no basis for reversal. We need not—and do not—imply what our ruling would have been had the point been preserved by compliance with Rule 84.04(d).

We next address Plaintiff's second and sixth points. The second point maintains the trial court erroneously ruled Plaintiff failed to prove its allegation that it is a banking corporation organized and existing under the laws of Missouri. The sixth point states the trial court erroneously ruled Plaintiff failed to prove any consideration for either note.

Because of our rejection of Plaintiff's first point, the second and sixth points are moot.

That is because a ruling by us in favor of Plaintiff on both points would not change our conclusion that no manifest injustice or miscarriage of justice resulted from the directed verdict. Consequently, we need not address those points.

The same analysis applies to Plaintiff's third point. It avers the trial court erred in excluding from evidence the "Guaranty" signed by defendants Thompson (Plaintiff's Exhibit 28). Even had the trial court received Exhibit 28 in evidence, that would not alter our decision that no manifest injustice or miscarriage of justice resulted from the directed verdict.

Plaintiff's fourth point argues the trial court erred "in ruling there was no evidence of attorney's fees." We considered the attorney fee issue in addressing Plaintiff's first point. No further discussion is required. Point denied.

Plaintiff's fifth point, the only one left, declares the trial court erred in refusing to receive Plaintiff's Exhibit 76 in evidence. Exhibit 76, a 29–page document, was identified by Plaintiff's president, Schmidt, as "microfiche copies of the statements to [SBG & CC] on a monthly basis ... the first statement ends June 30 of 1988 and the last statement is 3–30 of 1990."

Questioning of Schmidt by the Thompsons' lawyer revealed that "advances" on a loan by Plaintiff to a borrower are made by either depositing a "bank check" in the borrower's account or by a "direct debit" on the loan simultaneously with a "direct deposit" in the borrower's account. These steps are substantiated by routine documentation.

The Thompsons objected to Exhibit 76 on the ground that it was "a summary and not in fact the record itself," hence its admission would offend "the best evidence rule." The Thompsons maintained Plaintiff should produce "the actual documents representing the advances."

The Beggans' lawyer objected to "the interest listed on [Exhibit 76] unless there is

some evidence showing the method of calculation, the percentage rate ... referred to at that time as to this *Wall Street Journal* or whatever."

The trial court ruled Plaintiff would have to "establish that foundation." The trial court rejected Exhibit 76 "on the basis that [it] is a summary and that is not the best evidence as to the transactions that occurred."

Confronted by that ruling, Plaintiff's lawyer did not proffer any theory of admissibility for Exhibit 76. Instead, Plaintiff's lawyer subsequently questioned Schmidt:

"Q ... Now, with regard to Plaintiff's Exhibit Number 76, the objection was, I believe, that this isn't the best evidence because it doesn't contain the certain items that are referred to, debit slips, credit slips, checks. Now, are copies of all of those items kept at the bank?

A Yes, sir.... We have the original checks and we should have the original internal debit tickets to the loan.

Q And they are in the possession of the bank at First Bank Centre; is that correct?

A Yes, sir."

At that juncture, Plaintiff's lawyer requested, and was granted, a recess to enable Schmidt to "go to the bank and obtain those documents."

After the recess, Schmidt identified Plaintiff's Exhibit 88 as a "loan check" payable to SBG & CC for $4,345.55, apparently endeavoring to substantiate one of the entries on Exhibit 76.

Defendants Thompson, French and Beggan objected to Exhibit 88 on the ground that Plaintiff had failed to produce it in response to requests for production of all checks pertinent to the two loans.

The objection was debated at length (transcript pages 526 to 562). Plaintiff's lawyer told the trial court that counsel for the objecting defendants had been allowed to use Plaintiff's conference room and examine "everything they asked for." Counsel for the objecting defendants denied Exhibit 88 had been produced by Plaintiff.

The trial court asked Plaintiff's lawyer whether the loan checks had been produced. Plaintiff's lawyer replied: "I don't know. I don't know if these items were brought out."

The trial court asked counsel for the objecting defendants how they would be prejudiced if the trial court received the loan checks in evidence.

Counsel for defendants Thompson replied that the loan checks would enable Plaintiff to prove the dates and amounts of the disbursals which Plaintiff had thus far been unable to prove and could not otherwise prove. Counsel for defendants French pointed out that inasmuch as interest began accruing on each disbursal at the time it was made and there was a variable interest rate, effective cross-examination would be impossible.

The trial court excluded the "loan checks." After that ruling, Plaintiff made no further attempt to place Exhibit 76 in evidence.

Plaintiff now insists the trial court should have received Exhibit 76 as a business record under § 490.680, RSMo 1986, in that Schmidt's testimony "appears to be adequate foundation for admission of this exhibit." The flaw in that argument is that it was not presented to the trial court.

▇▇▇ When Plaintiff's lawyer asked for the recess to enable Schmidt to marshal the loan checks and other documents substantiating the loan disbursals, the trial court could have reasonably inferred that Plaintiff's lawyer believed the "best evidence" objection was valid, otherwise Plaintiff's lawyer would not have sent Schmidt on that errand. When the trial court held the loan checks inadmissible because Plaintiff failed to produce them during discovery, Plaintiff's lawyer did not argue to the trial court that Exhibit 76 was independently admissible as a business record. Therefore, the trial court never had occasion to consider whether Exhibit 76 was

admissible on that theory.[8] An appellate court will not, on review, convict a trial court of error on an issue which was not put before it to decide. *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 36[12] (Mo. banc 1982), *appeal dismissed*, 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983).

 Furthermore, because Plaintiff appeared to concede the validity of the "best evidence" objection at trial, we will not allow Plaintiff to charge the trial court with error on appeal by asserting that Exhibit 76 was erroneously excluded. A party cannot lead a trial court into error and then employ the error as a source of complaint on appeal. *In re Marriage of Collins*, 875 S.W.2d 643, 648[8] (Mo.App.S.D.1994); *Reed v. Rope*, 817 S.W.2d 503, 509[11] (Mo.App.W.D.1991).

Plaintiff's fifth point is denied.

Judgment affirmed.

GARRISON, P.J., and PREWITT, J., concur.

8. Defendants *Thompson* assert Schmidt's testimony was insufficient to qualify Exhibit 76 for admission as a business record. Their brief says: "No testimony was presented specifically as to Exhibit 76 that it was prepared in the ordinary course of [Plaintiff's] business, that it was in the custody of Mr. Schmidt, or that it was made at or near the time of the event."