

# Missouri Court of Appeals

## Southern District

### Division Two

STATE OF MISSOURI, ex rel. )
ATTORNEY GENERAL ERIC )
SCHMITT, )
          )
    Plaintiff-Respondent, )
          )
v. )    No. SD35829
          )
SCHIER COMPANY, INC., and )    **Filed: January 28, 2020**
GARY ALLEN SCHIER, )
          )
    Defendants-Appellants. )

### APPEAL FROM THE CIRCUIT COURT OF WRIGHT COUNTY

Honorable Kenneth F. Thompson

**AFFIRMED**

Schier Company, Inc. ("Schier Co.") and Gary Allen Schier ("Schier")

(collectively, "Defendants") appeal the trial court's judgment in favor of State of

Missouri, ex rel. Attorney General Joshua Hawley,[1] ("A.G.") for violations of the

Missouri Merchandising Practices Act ("MMPA"). Defendants claim the trial court erred

in entering judgment in favor of A.G. under the MMPA and awarding "rescission"[2]

because: (1) A.G. failed to meet its burden of proof on the element of "misrepresentation

or concealment, suppression or omission of a material fact"; (2) A.G. failed to meet its

---

[1] While this appeal was pending, Attorney General Eric Schmitt was substituted for Joshua Hawley as the respondent pursuant to Rule 52.13(d). All rule references are to Missouri Court Rules (2019).

[2] The judgment does not use the word "rescission"; it orders Defendants to "pay restitution of $79,400 to the State of Missouri pursuant to sec. 407.170.4 [sic] RSMo." Unless otherwise indicated, all statutory references are to RSMo 2016.

1

burden of proof on the element of "ascertainable loss"; (3) rescission was not pled in the petition or requested any time prior to trial; (4) there was no "evidence of probative force showing that [Schier] had actual or constructive knowledge of actionable wrong and participated therein" to hold Schier individually liable; and (5) "application of the MMPA is unfair, unjust, and outside the scope intended by the legislature[.]"

Finding the last of these claims outside of our purview and no merit in the others, we affirm.

## Standard of Review

We presume the judgment correct, and the appellant bears the burden of demonstrating reversible error. *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010). Therefore, we must affirm the judgment unless the appellant demonstrates that there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo banc 1976); Rule 84.13(d).

"Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the [trial] court's judgment." *Ivie v. Smith*, 439 S.W.3d 189, 199 (Mo. banc 2014). "Evidence has probative force if it has any tendency to make a material fact more or less likely." *Id.* at 199-200. To determine if the trial court's judgment is supported by substantial evidence, we "view the evidence and the reasonable inferences drawn from the evidence in the light most favorable to the judgment, disregard all evidence and inferences contrary to the judgment, and defer to the trial court's superior position to make credibility determinations." *Houston*, 317 S.W.3d at 186. All fact issues upon which no specific finding is made must be considered to

2

have been made in accordance with the result reached. *Ivie*, 439 S.W.3d at 200; Rule 73.01(c).

A judgment is against the weight of the evidence only if the trial court could not have reasonably found, from the record at trial, the existence of a fact necessary to sustain the judgment. *Id.* at 206. This challenge differs from a challenge to the sufficiency of the evidence. It is a test of how much persuasive value evidence has—not simply whether sufficient evidence exists that tends to prove a necessary fact. *Id.* Like a substantial-evidence challenge, however, we defer to the trial court's factual findings when those alleged facts are contested. *Id.* at 200, 206. The against-the-weight standard serves only as a check on a trial court's potential abuse of power in weighing the evidence. *Id.* at 206.

### The Evidence

Dairymen's Best Creamery Cooperative, LLC ("Dairymen's Best") is a co-op of dairy farmers formed for the purpose of processing milk into marketable milk products.[3] Dairymen's Best hired David Cline ("Cline") to manage and supervise the construction of the dairy-processing plant. Cline's responsibilities included ordering the dairy-processing equipment necessary to get the plant operational.

Schier Co. is a company that buys and sells used dairy-processing equipment to dairy operations. Schier Co. does not itself refurbish or manufacture dairy equipment or parts; it obtains all such equipment and parts from third parties. Schier is the founder, sole owner, and president of Schier Co. In his role as president, Schier is "responsible for

---

[3] Dairymen's Marketing Cooperative, Inc. ("DMCI") is the parent company of Dairymen's Best. DMCI operates by obtaining raw milk from its members and then markets that milk to dairy processors. DMCI began exploring ways to process DMCI's milk into milk products to avoid the costs associated with transporting the milk to a processor. Dairymen's Best was the entity created to carry out that mission.

3

everything that the company does[,]" including approving the contents of the company's website.[4] Schier Co.'s website states "[w]e inspect each one of our new and used, reconditioned pieces for the highest quality and efficiency to ensure that all our equipment is long-lasting and reliable." While the website guaranteed Schier Co.'s reconditioned equipment to be "free from defects[,]" it excluded equipment and pieces obtained from third-party vendors.

Cline, on behalf of Dairymen's Best, began looking for dairy-processing equipment to order for the plant. He reviewed Schier Co.'s website and recommended to the board of Dairymen's Best that the necessary processing equipment be ordered from Schier Co. Dairymen's Best followed that recommendation and ordered a milk pasteurizer[5] from Schier Co.

When the pasteurizer arrived, it appeared that all of its valuable parts had been removed. The parts that remained were not usable. When inspectors from the State Milk Board came to inspect the pasteurizer, it failed the inspection. When contacted after that failed inspection, Schier agreed to take the machine back and provide a $20,000 credit toward the purchase of a new machine with an upgraded capacity to 1,000 gallon per hour.

Schier told Cline that the second pasteurizer would be built from the frame of a used pasteurizer with new components that would make the machine "like new[.]" Schier personally spoke with Cline and promised that the second pasteurizer would be

---

[4] According to the Schier Co. website, Schier is "involved in locating and providing equipment to the people that are going to build their plant or change equipment in the plant or add a piece of equipment to the plant." Schier has never manufactured dairy products. Schier "deal[s] with people purchasing equipment from all over the world[.]"

[5] The evidence was that a milk pasteurizer is a piece of equipment that "heats the milk to kill any pathogens that are in the milk that might be harmful to . . . a consumer" and thus is "vital to dairy manufacturing."

"PMO [Pasteurized Milk Ordinance] compliant."[6] The written invoice for the second pasteurizer (the "HTST pasteurizer") stated it would be a "PMO legal 1,000-gallon-per-hour HTST pasteurizer system[.]"[7]

Dairymen's Best ordered the HTST pasteurizer on January 5, 2015, and remitted the down payment on January 21, 2015.[8] Dairymen's Best paid the remaining balance on the HTST pasteurizer before delivery was made. Dairymen's Best paid for all equipment it received from Schier Co. in full. The total amount paid by Dairymen's Best for the HTST pasteurizer was $79,400.

After delivery, Dairymen's Best discovered that the HTST pasteurizer had been refurbished in Mexico. Dairymen's Best did not know that the equipment would be coming from Mexico, and it would not have purchased a piece of equipment that did not have nearby factory support. Defendants did not inspect the HTST pasteurizer prior to delivery.

Dairymen's Best hired a local metal-working company to install the HTST pasteurizer. After installation, inspectors from the State Milk Board inspected the HTST pasteurizer. The inspectors observed several defects in the equipment that rendered it PMO non-compliant. Don Falls, an inspector and state rating officer for the State Milk Board, determined that the HTST would not pass under PMO regulations because: the

---

[6] To be used in the production of dairy products, Missouri requires pasteurizers to pass an inspection performed by the State Milk Board. To pass inspection, pasteurizers must comply with a series of regulations called the Pasteurized Milk Ordinance ("PMO"). Evidence at trial indicated that the PMO is promulgated by the Food and Drug Administration and has been adopted by all 50 states.

[7] An HTST pasteurizer heats and cools the milk continuously as it flows through the machine. Schier Co.'s website advertised "New Custom Built HTST High Temperature Short Time Pasteurizes [sic] for the Dairy Industry[.]"

[8] Schier Co. stated that the HTST pasteurizer would be delivered 60 days after the order, on March 4, 2015. While Cline was concerned about late delivery, he never told Schier Co. to skip inspecting the equipment. On May 15, 2015, Schier emailed Dairymen's Best that the HTST pasteurizer was being tested and would be ready to ship that day.

thermometers were too short to reach the milk flow; there was an improper slope in a holding tube along with an improperly oriented concentric reducer; there was a weld that was too rough; an improper vacuum-breaker was installed; the programmable logic controller ("PLC") was not pre-approved; and the balance-tank slope was incorrect. The HTST pasteurizer would not power-up unless factory technicians attached external computers to operate it. Even then, the equipment would not send the liquid through the entire process. There were also problems with the flow-diversion valves.[9] The homogenizer was not the correct size to work with the HTST pasteurizer because the rates of gallons per hour did not match. Because the inspectors were unable to determine who had manufactured the flow-diversion valves installed on the HTST pasteurizer, they were unable to certify the machine as PMO-compliant. Dairymen's Best would not have agreed to purchase a PMO non-compliant pasteurizer.[10]

In addition to the equipment's obvious defects, Schier Co. failed to provide information about the programmable logic controller ("PLC") -- the software that governs certain functions of the HTST pasteurizer.[11] Without that information, inspectors cannot determine if the software will perform as required.

Several of the tests the inspectors needed to run could only be done with the machine powered-up. And, as previously noted, the equipment would not turn on until a factory technician overrode the installed controls with an attached laptop computer. Two technicians from Mexico came to work on the machine, but neither was able to get the

---

[9] Flow-diversion valves are necessary to prevent unpasteurized milk from being sent to the pasteurized milk storage tank.

[10] For a few months, Dairymen's Best produced cheese curds and yogurt using the less efficient method of vat pasteurization. This method was not economically viable, and the plant was eventually closed.

[11] Under the PMO, vendors are required to "provide a built-in program for test procedures or a protocol that shall be provided so that all applicable public health tests . . . can be performed by the Regulatory Agency[.]"

HTST pasteurizer to operate. When the technicians turned the machine on, it would not maintain a temperature necessary for the machine to make milk flow in a forward direction so that it could be pasteurized.

Dairymen's Best documented a list of defects and provided it to Schier Co. in an email indicating that the HTST pasteurizer had failed inspection. Schier received the email and reviewed it, but he denied having any knowledge that inspectors said there were specific defects that prevented them from certifying the equipment as PMO-compliant.

Dairymen's Best obtained an estimate for the repairs required to make the equipment operable and PMO-compliant, and it requested that Schier Co. pay for the modifications. Defendants refused. Cline also requested that Schier Co. refund the money that Dairymen's Best paid for the non-compliant HTST pasteurizer.

A.G. filed a petition against Defendants alleging violations of the MMPA that claimed Defendants had engaged in unfair or deceptive trade practices by representing that the HTST pasteurizer was PMO-compliant when, in fact, it was not (Count 1), that Defendants concealed, suppressed, or omitted the material fact that the equipment was not PMO-compliant (Count 2), and that Defendants misrepresented that all equipment is inspected to ensure that it is long-lasting and reliable (Count 3). In its request for relief, A.G. requested, in part, that the trial court enter a judgment "[r]equiring Defendants, pursuant to [section] 407.100.4, to provide full restitution to any consumers who suffered any ascertainable loss." The trial court heard evidence and entered a judgment against Defendants. The judgment awarded A.G.: $79,400 for restitution; $7,940 for the

7

Missouri Merchandising Practices Fund; $1,000 as a civil penalty; and $85,901.27 for the costs of investigating and prosecuting the case.

**Analysis**

*Briefing Deficiencies*

Before we may address the merits of any of Defendants' arguments, we must consider the briefing deficiencies that have materially hindered impartial appellate review. Compliance with Rule 84.04 is mandatory "to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made." *Myrick v. Eastern Broad., Inc.*, 970 S.W.2d 885, 886 (Mo. App. S.D. 1998). These deficiencies alone are sufficient for us to deny each of Defendants' points.[12] *Bridges v. American Family Mut. Ins. Co.*, 146 S.W.3d 456, 458 (Mo. App. W.D. 2004).

First, Defendants have failed to comply with Rule 84.04(d). Rule 84.04(d)(1)(B) requires a point to "[s]tate concisely the legal reasons for the appellant's claim of reversible error[.]" "[E]ach *Murphy* ground is a separate, distinct legal claim." For instance, 'an against-the-weight-of-the-evidence' analysis is distinctly different from the analysis to be employed on a claim that a judgment is not supported by substantial evidence."[13] *Smith v. Great Am. Assur. Co.*, 436 S.W.3d 700, 703-04 (Mo. App. S.D. 2014) (citing *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 630 (Mo. banc 2014)).

---

[12] They also fail for other, substantive reasons as set forth *infra*.

[13] A not-supported-by-substantial-evidence challenge requires completion of the following three sequential steps:

    (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

    (2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,

    (3) demonstrate why that favorable evidence, when considered along with the reasonable

8

In points 1 and 2, Defendants claim that A.G. "failed to meet its burden of proof" as to a necessary element of a MMPA claim.[14]  Whether a necessary fact has been proven is a matter left solely to the fact-finder unless the proposition is not supported by substantial evidence or is against the weight of the evidence.  Here, Defendants claim neither.

As a result, Defendants have failed to follow the proper analytical framework necessary to support either a not-supported-by-substantial evidence or an against-the-weight-of-the-evidence challenge.[15]

---

inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

An against-the-weight-of-the-evidence challenge incorporates these three steps and then adds a fourth:

(1)  identify a challenged factual proposition, the existence of which is necessary to sustain
     the judgment;
(2)  identify all of the favorable evidence in the record supporting the existence of that
     proposition;
(3)  identify the evidence in the record contrary to the belief of that proposition, resolving all
     conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
(4)  demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Houston*, 317 S.W.3d at 187.

[14] Defendants' first point states, *in toto*:

> THE TRIAL COURT ERRED IN GRANTING JUDGMENT IN FAVOR OF [A.G.] UNDER THE [MMPA], BECAUSE [A.G.] FAILED TO MEET THE BURDEN OF PROOF AS TO THE NECESSARY ELEMENTS OF THEIR ACTION ALLEGING VIOLATION OF THE MMPA, IN THAT [A.G.] FAILED TO SHOW THAT DEFENDANTS ENGAGED IN MISREPRESENTATION OR CONCEALMENT, SUPPRESSION OR OMISSION OF A MATERIAL FACT.

Point 2 claims the trial court erred in granting judgment in favor of A.G. under the MMPA because A.G. "failed to show that [Dairymen's Best] suffered an ascertainable loss."
[15] Defendants' attempted to correct this defect by identifying a *Murphy* claim in their reply brief.  Such a procedure comes too late as arguments omitted from an initial brief may not be supplied by a reply brief. *Russell v. Division of Emp't Sec.*, 43 S.W.3d 442, 444 (Mo. App. S.D. 2001).  Even then, the reply brief

Defendants' fourth point claims the trial court erred in holding Schier individually liable "because there was *no evidence of probative force* that would justify individual liability for corporate acts, in that [A.G.] . . . failed to produce evidence . . . showing that [Schier] had actual or constructive knowledge of actionable wrong and participated therein." (Emphasis added.) Although this point arguably asserts a not-supported-by-substantial-evidence claim, it fails for the same reason as points 1 and 2: Defendants' argument is deprived of any analytical or persuasive value by its failure to engage in the analytical process set forth in *Houston*. *J.A.R.*, 426 S.W.3d at 632.

Further, all five of Defendants' error-claims violate Rule 84.04(e), which requires that "[f]or *each* claim of error, the argument shall also include . . . the applicable standard of review." (Emphasis added.) While Defendants included a general section titled "Standard of Review[,]" that section does not specify the standard of review applicable to each claim of error.

Finally, Defendants' brief also fails to explain how each challenge was preserved for appellate review. Rule 84.04(e) requires appellants to include in their argument for each claim of error "a concise statement describing whether the error was preserved for appellate review[.]" We "will not, on review, convict a trial court of error on an issue which was not put before it to decide." *First Bank Centre v. Thompson*, 906 S.W.2d 849, 859 (Mo. App. S.D. 1995). "Even in a court-tried case, where a post-trial motion is not necessary to preserve an otherwise properly raised issue for appellate review, the

---

incorrectly combines a not-supported-by-substantial-evidence challenge with an against-the-weight-of-the-evidence challenge. Points that include multiple issues are multifarious and preserve nothing for appellate review. *City of Joplin v. Wallace Bajjali Dev. Partners, L.P.*, 522 S.W.3d 327, 330 (Mo. App. S.D. 2017). A point relied on should contain only one issue, and parties may not group multiple challenges into a single point relied on. *Id.; J.A.R.*, 426 S.W.3d at 630 n.10; *Cooper v. Bluff City Mobile Home Sales, Inc.*, 78 S.W.3d 157, 167 (Mo. App. S.D. 2002) (collapsing disparate contentions of error into a single point relied on is a violation of Rule 84.04(d)).

appellant must make some effort to bring the alleged error to the trial court's attention." *Heck v. Heck*, 318 S.W.3d 760, 767 (Mo. App. W.D. 2010) (citation omitted).

Defendants, by failing to comply with Rule 84.04(e), have failed to provide us with the information necessary to determine if the arguments they now present were actually presented to the trial court. It is not this court's duty to supplement a deficient brief with its own research. *In re V.C.N.C.*, 458 S.W.3d 443, 447 (Mo. App. E.D. 2015), *abrogation on other grounds recognized by In re K.M.A.-B.*, 493 S.W.3d 457, 473 n.6 (Mo. App. E.D. 2016). "Neither is it our job to 'comb the record' in search of facts to support [Appellants'] claim of error or demonstrate it is properly preserved for appellate review." *Carruthers v. Serenity Mem'l Funeral & Cremation Serv., LLC*, 576 S.W.3d 301, 305 (Mo. App. E.D. 2019) (quoting *Wong v. Wong*, 391 S.W.3d 917, 919-20 (Mo. App. E.D. 2013)).

By failing to comply with the rules of appellate procedure, Defendants have preserved nothing for our review. *In re Marriage of Fritz*, 243 S.W.3d 484, 487 (Mo. App. E.D. 2007); *Smith*, 436 S.W.3d at 704 n.4. Points 3 and 5 also fail for other reasons that we will address briefly, *ex gratia*.

*Point 3 – Rescission as the Appropriate Remedy*

Defendants' third point claims the trial court erred in granting rescission "because rescission was not timely requested, in that there was no evidence that [Dairymen's Best] requested a rescission of the alleged agreement in the pleadings or at any time prior to trial." Defendants' argument is unavailing as the language of the judgment ordered Defendants to pay "*restitution* of $79,400[,]" and A.G. unequivocally requested, in paragraph C of its request for relief, that the trial court enter a judgment "[r]equiring Defendants, pursuant to [section] 407.100.4, to provide *full restitution* to any consumers

11

who suffered any ascertainable loss." Defendants' use of the word "rescission" ignores the actual relief sought in A.G.'s request for relief.

To satisfy Rule 55.05, "the pleading need not label the plaintiff's theory of recovery." ***Sivigliano v. Harrah's N. Kansas City Corp.***, 188 S.W.3d 46, 49 (Mo. App. W.D. 2006). "The purpose of fact-pleading is to present, define[,] and isolate the controverted issues so as to advise the trial court and the parties of the issues to be tried and to expedite the trial of a cause on the merits." ***Id.*** at 48 (citation omitted).

Here, Defendants were sufficiently advised that A.G. was seeking to restore Dairymen's Best to its prior position. The language in Paragraph C of A.G.'s Petition against Defendants advised Defendants that A.G. was seeking "full restitution[,]" and it even referenced section 407.100.4, the statutory basis for the request. Section 407.100.4 provides:

> The court, in its discretion*, may enter an order of restitution, payable to the state, as may be necessary to restore to any person who has suffered any ascertainable loss, including, but not limited to, any moneys or property, real or personal,* which may have been acquired by means of any method, act, use, practice or solicitation, or any combination thereof, declared to be unlawful by this chapter. It shall be the duty of the attorney general to distribute such funds to those persons injured. Such funds may or may not be interest-bearing accounts, but any interest which accrues to any such account shall be sent at least annually by the attorney general to the director of revenue to be deposited in the state treasury to the credit of the state general revenue fund.

(Emphasis added.)

Defendants had notice of—and the court had discretion to award—restitution. Defendants' argument that "rescission" was not requested ignores that notice and the language of the judgment stating that Defendants "shall pay *restitution* of $79,400[,]" not

that "rescission" was being granted.[16]  Restitution (as opposed to rescission) merely requires the restoration of Dairymen's Best to the position it would have occupied if the transaction with Defendants had never been made.  A.G. had the ability to request restitution in its petition, and the trial court had the necessary discretion to award it.[17]

Point 3 is denied.

*Point 5 – The Public Policy Argument*

Point 5 claims:

> The trial court abused its discretion in granting judgment in favor of [A.G.] under the [MMPA], because application of the MMPA is unfair, unjust, and outside the scope intended by the legislature, in that [Dairymen's Best] and [DMCI] had unclean hands, treating this dispute as a violation of the MMPA rather than . . . as a proxy for sophisticated corporate entities disputing a business transaction.

Point 5 fails to identify a legal argument that would warrant reversal by this intermediate appellate court.  Instead, Defendants make a public-policy argument that the

---

[16] "[R]escission of a contract involves restoration of the status quo of the parties[.]" ***Dilts v. Lynch***, 655 S.W.2d 118, 121 (Mo. App. S.D. 1983).  "Rescission damages are provided when a party rescinds the contract by returning the property to the seller, thus entitling that party to a refund." ***Kerr***, 439 S.W.3d at 813.  While rescission necessarily requires restoring the parties to the status quo, restitution, as used in section 407.100.4, merely requires restoring the consumer (as opposed to both parties) to the consumer's prior position.  Restitution is defined as "restoration of [the] status quo and is the amount which would put *plaintiff* in as good a position as he would have been if no contract had been made, and restores *to plaintiff* [the] value of what he parted with[.]" ***Harris v. Desisto,*** 932 S.W.2d 435, 447 (Mo. App. W.D. 1996) (citing *Black's Law Dictionary* 1313 (6th ed. 1990)) (emphasis added).  Section 407.100.4 makes no mention of "rescission" or placing the *defendant* in the same position it would have been in had the transaction at issue never occurred.  Although rescission and restitution are similar, they are nonetheless distinct remedies.

[17] The judgment does state that "Defendants . . . may arrange for the removal and remove the two HTSTs from their current location and into the possession of Defendants or their assigns."  To the extent that this relief might be considered "rescission," the authorization to have the equipment returned to Defendants at Defendants' option does not prejudice Defendants in any way.  "In order to demonstrate reversible error, therefore, an appellant must demonstrate that the challenged trial court ruling or action was legally erroneous *and* that appellant was *actually* prejudiced as a result of that erroneous ruling or action." ***In re J.G.H. v. Greene Cty. Juvenile Office***, 576 S.W.3d 257, 260 (Mo. App. S.D. 2019).  The trial court had discretion under the statute to restore Dairymen's Best to the position it had been in (i.e., order restitution).  Section 407.100.4.  To the extent that it erred in permitting a return of the HTST pasteurizer to Defendants at the option of Defendants, it is an error in Defendants' favor, putting them in a better position than they would have been in had the trial court merely ordered restitution to Dairymen's Best.

13

MMPA should not apply to this type of case but "should be subject to civil litigation rather than an action under the MMPA."

"Policy arguments, while useful in the face of an ambiguous statute, are of no benefit when the statute is not ambiguous." *State ex rel. McDonald's Corp. v. Midkiff*, 226 S.W.3d 119, 126 (Mo. banc 2007) (quoting *Havens Steel Co. v. Missouri Prop. & Cas. Ins. Guar. Ass'n*, 956 S.W.2d 906, 909 (Mo. banc 1997)).  Further, an intermediate appellate court is an "error-correcting court, not a policy making court[.]" *Wilder v. John Youngblood Motors, Inc.*, 534 S.W.3d 902, 913 (Mo. App. S.D. 2017) (quoting *Saint Francis Med. Ctr. v. Watkins*, 413 S.W.3d 354, 357 (Mo. App. S.D. 2013)).

Defendants do not argue that the MMPA is ambiguous.  Instead, Defendants ask us to redefine the reach of the MMPA to exclude claims involving a consumer that is a corporation.  Such a request is a public-policy argument to be presented to the citizens' elected representatives, not to this court.

Point 5 is also denied, and the judgment of the trial court is affirmed.


DON E. BURRELL, J. – OPINION AUTHOR

DANIEL E. SCOTT, P.J. – CONCURS

JEFFREY W. BATES, J. – CONCURS