**AVIS, INC., a corporation, Plaintiff,**
v.
**Frank B. CHARMATZ, Defendant.**
**No. 61 C 153(1).**

United States District Court
E. D. Missouri, E. D.

July 31, 1962.

---

Samuel H. Liberman, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., Ely, Bartlett, Brown & Proctor, Boston, Mass., for plaintiff.

E. H. Tenney, Jr., Tenney, Dahman & Mathewson, St. Louis, Mo., for defendant.

HARPER, Chief Judge.

Avis, Inc., a Maine corporation, plaintiff, whose principal place of business is Massachusetts, seeks in this action to recover damages against Frank B. Charmatz, a citizen and resident of Missouri. The amount in controversy, exclusive of interest and costs, exceeds $10,000, giving this court jurisdiction since there is diversity of citizenship and the rerequisite amount involved under Section 1332, 28 U.S.C.A.

Avis seeks to recover damages for a breach of fiduciary duty by Charmatz in secreting his interest and the interest of Fred A. Mudgett in East Coast Rentaway, Inc., in failing to inform Avis officials of vital facts material to their decision as to a proposed purchase of East Coast assets, and in conjunction with others inducing Avis to release valuable accounts for assets known to have a dubious value.

The testimony in this case discloses that Avis, in various cities throughout the United States, carries on the business of renting and leasing automobiles. The business is carried on through wholly owned subsidiaries and independent operations licensed by Avis. The name "Avis" or "Avis Rent-a-Car" is used in connection with the business whether carried on by a subsidiary or licensee. Avis exercises a measure of control over these outlets as the name "Avis" has achieved recognition in the car rental field.

Charmatz, an officer of Avis, entered into an agreement with Fred A. Mudgett, another officer of Avis, and one W. J. Henely, whereby they organized an Illinois corporation known as "East Coast Rentaway, Inc." By agreement, this arrangement was not disclosed to Avis, and the other officers of Avis did not become aware of it until after Avis had purchased the assets of East Coast. When organized, Mudgett, Charmatz and Henely each owned one-third of the stock in East Coast, although the stock of Mudgett and Charmatz was in the name of straw parties. After East Coast was organized on November 2, 1956, Charmatz, as vice president of Avis, in charge of its licensee division, arranged for East Coast to enter into a licensing agreement with Avis, whereby East Coast was granted the exclusive right to use the Avis name and system in the cities of Vero Beach, Delray Beach, Boynton Beach and Fort Pierce, Florida.

Subsequently, in September of 1957, through Charmatz, a similar agreement was executed whereby East Coast obtained the Avis franchise in Boca Raton, Deerfield Beach and Pompano Beach, Florida. Henely thereafter entered into agreements with Casco Auto Rental Company, Inc., whereby Casco's Palm Beach, Florida location leased automobiles to East Coast. To secure this arrangement with Casco, Henely personally guaranteed the payments for the leased automobile to Casco. Charmatz and Mudgett agreed with Henely to be liable on the guarantee to the extent of their interest.

Prior to April 1, 1958, Avis entered into negotiations with Casco for the acquisition of its stock. Meanwhile, Smith, an officer of Casco, was pressing Henely for payment of car rentals which were in arrears. Smith eventually discovered the interest of Mudgett and Charmatz in East Coast, and thereafter managed to acquire the interest of Henely without consideration. In about August, 1957, Charmatz, though still an officer of Avis, took over the operation of East Coast. There is some dispute as to the duration of Charmatz' management of East Coast,

but in view of the disposition to be made of the case it is not necessary to resolve this conflict. In May of 1958, Mudgett recommended that Avis purchase the assets of East Coast. At this time Avis was not aware of the interest of Mudgett and Charmatz in East Coast. It was represented to Avis that the business was owned by Henely, although in fact he had no beneficial interest in it. The deal was entered into on May 20, 1958, providing that $7,202 worth of assets in the form of notes, accounts receivable, prepaid expenses, signs, equipment, auto licenses, franchises, etc., be turned over to Avis. As purchase price for East Coast, Avis assumed various liabilities amounting to $19,371.00. Plaintiff has credited against this figure $4,064.30, representing $1,181.30 of the accounts receivable collected, $1,500, the value of the office equipment, $1,072, the value of the license plates, and $310 received from the collection on an employee's note, and seeks to recover in this action as damages the difference, or $15,337.63.

In arriving at this figure of alleged damages Avis gives no value whatever to the franchises, including the good will of the business, contending that Avis could have terminated the franchises without paying anything therefor. The evidence clearly shows that Charmatz was guilty of a breach of his fiduciary duty to Avis in concealing his interest in East Coast at the time of the sale. The law is so well settled that it needs no reference thereto, that where officers of a corporation are guilty of conflict of interest, the transaction can be rescinded regardless of its fairness. Avis is unable to rescind in this instance since it cannot restore the benefits conferred upon it by the defendant. Thus, Avis seeks damages. Relief to the corporation in instances of this kind may be afforded in law as well as in equity. Regional Land Corporation v. McLaughlin, 334 Mass. 276, 135 N.E.2d 24; Baker v. Allen, 292 Mass. 169, 197 N.E. 521.

In this connection, it should be noted that the sale involved was a Massachusetts contract and Massachusetts law applies, although with respect to this particular question the law of Missouri and Massachusetts is in agreement. It is well settled that in a case such as the one before the court the plaintiff has the right to sue for damages. The burden, however, of proving damages, is on Avis. It is not sufficient to show that the amount paid exceeded the value of the accounts receivable, office equipment, prepaid license plates and a note which was subsequently paid. Avis purchased a concern and its contention that it might have canceled the franchises is not sufficient to carry its burden of proof as to no value of the franchises and the good will of the company.

The only semblance of testimony on behalf of Avis that the franchises as going concerns had no value was the testimony of Morrow, the executive vice president of Avis. The basis for his testimony with respect to this phase of it was little more than the statement that Avis could have canceled the franchises on 30 days' notice for cause. The testimony, however, discloses that it was the policy of Avis not to cancel franchises because it was a fast-growing firm in the car rental field and it was felt by the officials of Avis that to cancel franchises might very adversely affect the securing of additional franchises and have some effect on those who already held franchises. The testimony further discloses that at the time of the purchase of these seven locations Avis was in the process of expanding its own operation of locations, that it had only recently purchased Casco, a Maine corporation, which had among others a franchise at Palm Beach, and that the locations in question tied in intricately with the Palm Beach operation and would enable it to become a more successful operation. It was the opinion of the officials of Avis that the better operation was to operate franchises both in the north and the south, enabling the owners thereof to shift their cars from the Gold Coast of Florida in the winter to the resort areas in the north in the summer. Morrow, when pressed with respect to the value of the fran-

chises, reluctantly admitted that Avis got something of value besides the accounts receivable, the office equipment, the prepaid license plates and the note, although he would not set a value thereon.

Exhibit F, which sets out income from four of the locations in question after the transfer, supports without question the fact that the franchises had value. Dumaine, the president of Avis, reluctantly admitted in his deposition that it was represented to him by officials of the company other than Charmatz, Mudgett and Smith at the time of the purchase, that these seven franchises had considerable value, in that among other things they would help to further their north and south dual operations. Mudgett, Smith and Henely each testified that the value of the seven franchises with the assets they had was in excess of the amount that Avis paid for them, and one could certainly not say that Henely was a friendly witness of Charmatz, for his deposition discloses that he would not even shake hands with the defendant at the taking of the deposition.

The burden was on Avis to show that what it received was not worth the amount it paid and it failed to carry the burden. The credible testimony is to the effect that it received physical assets, franchises and going concern values worth more than the $19,371 paid for them, and it cannot overcome this credible testimony with the statement or contention that it could have revoked the franchises. Avis purchased going businesses and not canceled franchises. Even if we speculate, in the face of their policy to the contrary that the franchise would have been canceled, it would have secured no locations from which to operate and would not have acquired what it actually secured by purchase.

■ Further, if we were to disregard the credible evidence of the defendant as to the value of the going business and take the testimony of the plaintiff's only witness on this phase (Morrow), and the court held that the going franchises were only worth a minimum amount in each instance of $500 each, a total of $3,500, Avis still could not recover. The defendant raised the defense that any damages incurred had been compensated by insurance. Avis admitted that it had received $12,000 from its insurer with respect to the transaction. The witness Sheridan, general counsel for Avis, testified that the $12,000 was paid by the insurance company in return for Avis not pressing its claim based on this transaction, and that Avis would have the right to pursue its claim, that in fact the $12,000 was for a reduction in insurance expenses. To be charitable with this witness, the court can only say that his testimony with respect to this transaction is completely refuted by the credible testimony. The record is replete with the testimony of everyone else connected with the $12,000 settlement. Crow, the manager of the insurance claims department, Latta, a member of the firm which wrote the insurance, Gilliot, manager of the insurance company's district office in Philadelphia, Jackson, a member of the company which wrote the policy—each of these witnesses completely discredit the testimony of Sheridan. Each of these gentlemen state that the $12,000 was in settlement of the claim filed by Avis with Continental Casualty Company for this particular transaction. Each of the witnesses denied that anyone ever said to Sheridan that the company would not press its subrogation rights, and Dumaine, the president and treasurer of Avis, in his deposition stated that the $12,000 was recovered on the fidelity bond as a result of this transaction in a settlement with the bonding company on this claim. All of this testimony was known to Sheridan before he testified, since the testimony of these other witnesses was by deposition, yet in the face of such, and in the face of the fact that on the check paid to the company, the claim number is written thereon, he would have this court believe that Continental had no interest in the recovery of this $12,000, that it was not a settlement on the claim under the fiduciary bond, and that it was a reduction of insurance premium.

While the claim number may have been placed on the check at a later date, it supports the testimony of the other parties with respect to this transaction. The attitude and demeanor of Sheridan on the witness stand was one of a very bitter, prejudiced witness.

■ The credible evidence discloses that the $12,000 paid by the insurance company on its fiduciary bond was for the purpose of settling a claim that Avis had against Continental Casualty, based upon the transaction that is involved in this litigation. The court is confident that economic pressure entered into the insurance company's paying this amount, since the insurance company in addition to this bond carried the public liability and property damage insurance on the cars of Avis, a premium that I am confident was substantial, but even though economic pressure may well have entered into the securing of this settlement, the settlement was for the very transaction involved in this lawsuit, and to permit Avis to recover that $12,000 would be giving it in this case a double recovery as to the $12,000. As previously stated, the plaintiff has failed in its effort to establish any damages with respect to this matter, but as set up above, it has none, and even if we put a minimum value, which we have no right to do under the testimony, on the franchises of $500, apiece, Avis could not recover because it has been more than paid its damages by the insurance company. The court recognizes in subrogation matters that when two parties have an interest in a matter, either party may sue, but in this instance since the $12,000 more than covers the loss of Avis, if it had any loss at all, it cannot recover, because otherwise double recovery would be possible. The Supreme Court in United States v. Aetna Casualty & Surety Co., 338 U.S. 366, l. c. 380–381, 70 S.Ct. 207, l. c. 215, 94 L.Ed. 171, said: "If the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name."

Since the plaintiff's own testimony in this case does not show Avis could recover as much as $12,000, this is a second reason why the plaintiff cannot recover in the case on its claim for damages, for it is not the real party in interest.

The court will accordingly find that the plaintiff cannot recover and judgment will accordingly be entered for the defendant. The court adopts this memorandum opinion as its findings of fact and conclusions of law, and the clerk will prepare the proper judgment to be entered by the court in accordance with this opinion.