Thomas **ZAKIBE**, Plaintiff/Appellant/
Cross–Respondent,

v.

**AHRENS & McCARRON, INC.,**
Defendant/Respondent/
Cross–Appellant.

v.

**Barbara Zakibe, Third–Party**
Defendant/ Cross–
Respondent,

and

**Robert Noble, Third–Party Defendant.**

**Nos. ED 76080, ED 76081.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 15, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 4, 2000.

Francis E. Pennington, III, Francis X. Neuner, Jr., Dankenbring, Greiman & Osterholt, St. Louis, for appellant.

Michael A. Fisher, Henry F. Luepke, The Stolar Partnership, St. Louis, for respondent.

KATHIANNE KNAUP CRANE, Presiding Judge.

This consolidated appeal arises from a lawsuit brought by a former corporate officer and director against the corporation which employed him. The officer sought to recover bonuses, severance pay, and other compensation which he claimed were due him under his employment contract upon termination. The corporation contended that the officer's breaches of his employment contract and of his fiduciary duty precluded his recovery. The corporation also sought damages for the officer's breach of fiduciary duty. The jury returned a verdict in the corporation's favor on both the petition and the counterclaim and awarded it damages in the amount of

$150,000. The corporation also filed third-party claims, including a conspiracy claim against the officer's wife, on which the court directed a verdict.

Both parties appeal. The officer challenges the submissibility of the corporation's case and affirmative defenses and certain jury instructions. The corporation contends that the trial court erred in directing a verdict on its claim of civil conspiracy. We affirm.

## FACTUAL BACKGROUND

We recite the facts in the light most favorable to the jury's verdict. Defendant, Ahrens & McCarron, Inc. is a building products wholesaler, principally engaged in the business of selling plumbing supplies in the City of St. Louis, Missouri. Prior to 1986 the corporation was owned and managed by Donald Ahrens, the husband of Shirley Ahrens. Mrs. Ahrens became the sole shareholder of the corporation following her husband's death in April, 1986.

Because Mrs. Ahrens had no experience running a business, she approached her father-in-law, who had sold the business to her husband, for advice. Mrs. Ahrens' father-in-law contacted plaintiff Thomas Zakibe, his son-in-law and Mr. Ahrens' sister's husband. Mr. Zakibe agreed to run Ahrens & McCarron. Mr. Zakibe has a bachelor's degree in business administration and a master's degree in finance. He had worked as an executive for the Sverdrup Corporation for 15 years before accepting the position with Ahrens & McCarron. Mrs. Ahrens hired Mr. Zakibe because of his expertise.

Mr. Zakibe entered into an employment agreement on June 19, 1986 under which he agreed to work full-time for Ahrens & McCarron for seven years from June 16, 1986 until June 15, 1993. The employment agreement provided that Mr. Zakibe would serve as Executive Vice President and General Manager and as a member of the Board of Directors and would provide "financial and general operational manage-ment of the company within the scope of authority specifically delegated to him by Company." The agreement also specified under Terms and Duties:

E. Zakibe shall render service to Company on a full-time basis. However, nothing contained herein shall prevent Zakibe from managing his personal investments, provided that such investments do not create a conflict of interest between Zakibe in his capacity as a corporate officer, and employee of the Company and further provided that the time expended for such personal investment does not interfere with Zakibe's performance of his duties to Company under this Agreement.

The compensation section of the agreement provided for an annual base salary and for annual incentive bonuses to be made no later than April 1 of the year immediately following the close of defendant's calendar year. The termination section provided in part A: "If this Agreement is terminated by Company, Company hereby agrees that it will pay in an amount equal to one hundred percent (100%) of the then current base annual salary of Zakibe, during the year of termination."

Mr. Zakibe assumed the duties of Executive Vice President and General Manager until 1991 when he became President of the corporation. In June, 1993 Mr. Zakibe and Mrs. Ahrens orally agreed that Mr. Zakibe's employment contract would continue on a year-to-year basis. Mr. Zakibe held these offices and served as a director until his termination in 1996. During this time Mr. Zakibe had the primary responsibility for managing the business of Ahrens & McCarron. Mr. Zakibe understood that he "had a duty to provide the utmost good faith and loyalty" to Ahrens & McCarron. Mr. Zakibe understood that a conflict of interest could arise where he would have an incentive to act against the best interests of someone he had a duty to serve.

Mrs. Ahrens served as a director and corporate officer during this time period,

but did not actively manage the company. She relied on Mr. Zakibe to run the business.

In November, 1993 Robert Noble, an Ahrens & McCarron employee, learned of an opportunity to buy the inventory of Showcase Kitchen and Bath. He spoke about it with Mr. Zakibe and decided to create a separate corporation, American Showcase, to buy the inventory and operate it as a wholesaler of kitchen and bath cabinets. Mr. Zakibe attempted to get Mrs. Ahrens to invest in American Showcase along with his wife, Barbara Zakibe. He told Mrs. Ahrens that Mrs. Zakibe would not invest unless she did. In March, 1994 Mr. Noble left his employment at Ahrens & McCarron to start American Showcase without giving advance notice to Mrs. Ahrens.

Without Mrs. Ahrens' knowledge, Mr. Zakibe contacted Mrs. Ahrens' personal attorneys and asked them to prepare shareholder documents for American Showcase that listed Mrs. Ahrens as a shareholder. In March or April, 1994 Mr. Zakibe gave the documents to Mrs. Ahrens, but she never signed these documents. Mr. Zakibe urged Mrs. Ahrens to invest in American Showcase on several occasions. Mrs. Ahrens was upset by Mr. Noble's departure and did not want to invest in American Showcase. She never invested any money in American Showcase and never became a shareholder.

On April 29, 1994 Mr. Zakibe invested $50,000 in American Showcase by means of a $50,000 check drawn on Mr. and Mrs. Zakibe's joint bank account and signed by himself. The check bore the annotation "25% of total shares." Mr. Zakibe did not obtain Mrs. Ahrens' permission to make the investment. However, he considered that his investment in American Showcase might constitute a conflict of interest.

In June, 1994, Mrs. Ahrens heard from an employee that Mrs. Zakibe had invested in American Showcase. She asked Mr. Zakibe whether the investment presented him with a conflict of interest. Mr. Zakibe indicated that he had no conflict of interest because the money invested in American Showcase belonged to his wife and not to himself. Mrs. Ahrens accepted this explanation.

Mr. Zakibe never disclosed to Mrs. Ahrens that he had his own interest in American Showcase. Further, on different occasions between 1994 and 1996 Mr. Zakibe represented to Mr. Noble, as well as to Ahrens & McCarron's comptroller, and Ahrens & McCarron's accountant, that Mrs. Zakibe was the source of the investment and owned American Showcase. In addition, Mr. Zakibe testified in his deposition and in response to written interrogatories asking whether he or his wife had invested in American Showcase that, "My wife invested in American Showcase." At trial, Mrs. Zakibe testified that her separate funds had not been invested in American Showcase and were in a separate account, not the joint account on which the check constituting the investment was drawn. She also acknowledged that her husband was really the participating shareholder in American Showcase.

After he invested in American Showcase, Mr. Zakibe became actively involved with its operations. He periodically went out to American Showcase to discuss the business and its customers. He also began using Ahrens & McCarron's resources to benefit American Showcase. He signed a guarantee as president of Ahrens & McCarron which caused Ahrens & McCarron to guarantee the payment by American Showcase for cabinets in the amount of $100,000. Although the guarantee recited that Mr. Zakibe signed the guarantee by order of Ahrens & McCarron's Board of Directors, Mr. Zakibe never informed Mrs. Ahrens of the guarantee or obtained her consent to make it. The board of directors likewise did not authorize this guarantee.

Mr. Zakibe told Mrs. Ahrens that Ahrens & McCarron was going to sell merchandise to American Showcase at ten percent over cost. He later indicated to Mrs.

Ahrens that Ahrens & McCarron was making a profit on its sales to American Showcase. However, Mr. Zakibe started selling Ahrens & McCarron's products to American Showcase at cost. Ahrens & McCarron made no profit on these sales at cost.

From its inception, American Showcase was undercapitalized. By November, 1994, Mr. Zakibe knew that American Showcase was financially troubled and losing money.[1] Mr. Zakibe was aware that if American Showcase went out of business he would lose his investment.

In November, 1994 Mr. Noble and Mr. Zakibe had an American Showcase shareholders' meeting to discuss American Showcase's financial problems and how to resolve them. They did not keep any minutes of that meeting. They agreed that Ahrens & McCarron would continue selling its merchandise to American Showcase at cost. Mr. Zakibe also agreed to allow American Showcase to use Ahrens & McCarron's warehouse and shipping facilities free of charge. They talked about paying and promising to pay American Showcase's debts and allowing the debt to run up to $400,000. Mr. Zakibe decided that Ahrens & McCarron would allow American Showcase unlimited credit, although Ahrens & McCarron's written credit policy prohibited allowing more than $25,000 credit to any customer. Mr. Zakibe arranged for Ahrens & McCarron to pay American Showcase's vendors directly. He admitted using Ahrens & McCarron's money to buy products for American Showcase.

In April, 1995, while Earline McCubbin, Ahrens & McCarron's accounting manager, was on vacation, Mr. Zakibe had an Ahrens & McCarron check for between $25,000 and $27,000 drawn to pay a vendor to purchase inventory for American Show-

case. Ms. McCubbin discovered the check when she returned and requested backup documentation from Mr. Zakibe. He eventually gave her an invoice for American Showcase which she believed American Showcase never paid. Mr. Zakibe never informed Mrs. Ahrens that he had directed Ahrens & McCarron's bookkeeping department to pay this invoice.

In the spring of 1995, Mrs. Ahrens had a meeting with Mr. Zakibe and Ms. McCubbin to resolve problems raised by Ms. McCubbin on how to book the checks paying for inventory for American Showcase. At that meeting Mr. Zakibe told Mrs. Ahrens that American Showcase's debt to Ahrens & McCarron was $50,000, although it was actually substantially more. Mr. Zakibe assured Mrs. Ahrens that American Showcase would be able to pay its debt. He told her that Ahrens & McCarron had to continue to sell to American Showcase; otherwise, American Showcase would not be able to service its customers and pay its debt to Ahrens & McCarron. Mr. Zakibe recommended that Mrs. Ahrens sign a lease on behalf of Ahrens & McCarron for property which Ahrens & McCarron would rent to American Showcase for American Showcase to use as its new business location. Mr. Zakibe told her that the lease would protect Ahrens & McCarron against American Showcase's debt because it would give Ahrens & McCarron control over American Showcase's inventory, which included displays valued at $50,000, the amount Mrs. Ahrens believed was the outstanding debt. In fact, Ahrens & McCarron had no security on American Showcase's debt. Mr. Zakibe advised Mrs. Ahrens that the lease would not cost Ahrens & McCarron anything because American Showcase would pay rent in the amount of the lease payments. He also recommended that American Showcase be allowed to use some of Ahrens &

---

1. On August 28, 1995 American Showcase's accountants reported a loss of $128,111 for fiscal year 1994. Its then-current liabilities exceeded its assets by $161,374. In their cover letter to the financial statements, Amer-

ican Showcase's auditors expressed "uncertainty as to the company's ability to continue as a going concern." Mr. Zakibe was aware of the auditors' concern.

McCarron's vacant warehouse space and operate its trucks from the warehouse. Mr. Zakibe assured Mrs. Ahrens that this arrangement was beneficial to Ahrens & McCarron because Ahrens & McCarron was selling American Showcase extra equipment that would go into the jobs for which American Showcase was supplying cabinets.

In May, 1995 Mrs. Ahrens asked the company's outside accountant, James Castellano, to attend a meeting with her to listen to Mr. Zakibe explain American Showcase's business and customer relationship with Ahrens & McCarron. Mrs. Ahrens was trying to get an understanding of what had been established. Mr. Zakibe told Mr. Castellano that American Showcase was a customer of Ahrens & McCarron which gave Ahrens & McCarron the opportunity to increase its sales and earn additional profit. He also told Mr. Castellano that Ahrens & McCarron was selling to American Showcase at a profit.

In the summer of 1995, as a result of an employee search conducted by Mr. Castellano, Mrs. Ahrens hired Mike Connors to be the comptroller for Ahrens & McCarron. As comptroller, Mr. Connors reported to Mr. Zakibe. Mr. Zakibe told Mr. Connors that Mrs. Ahrens and Mrs. Zakibe owned American Showcase and that American Showcase had unlimited credit with Ahrens & McCarron. After starting employment, Mr. Connors learned that Ahrens & McCarron was selling products at cost to American Showcase and not making any profit on its sales. Mr. Zakibe justified this to him on the grounds that it created some tax advantages. Mr. Connors testified that Ahrens & McCarron was absorbing $40,000 a year in American Showcase's warehouse and administrative costs and that American Showcase's account receivable came close to $500,000, was unsecured, and was not being collected. He testified that Ahrens & McCarron was losing $50,000 interest per year on the account receivable and that the account receivable was causing a drain on Ahrens

& McCarron's cash flow. At trial, Mr. Zakibe acknowledged that the dealings with American Showcase drained some cash out of Ahrens & McCarron. Mr. Zakibe testified that Ahrens & McCarron began experiencing cash flow problems in 1994 which continued through 1996.

In October, 1995 Mr. Zakibe signed an agreement purchasing advertising for American Showcase. Ahrens & McCarron paid for the advertising.

Mr. Castellano's accounting firm audited Ahrens & McCarron's December 1995 financial statements, which disclosed that Ahrens & McCarron was transferring merchandise to American Showcase at cost, that American Showcase's debt had grown to $383,322, that the debt was not being paid currently, and that the debt was unsecured. The accountants advised Mrs. Ahrens of this situation at their annual meeting with her in March, 1996. This was when she first learned of the magnitude of American Showcase's debt and the financial problems it was causing Ahrens & McCarron. As a result of this situation and other problems, she considered terminating Mr. Zakibe. Preparatory to making this decision, she asked Mr. Castellano's accounting firm and another organization to investigate and evaluate Ahrens & McCarron's business.

In late spring of 1996, Mrs. Ahrens, Mr. Connors, Mr. Zakibe, and Mr. Castellano met to discuss getting a security interest on the debt owed by American Showcase and making changes in its corporate ownership so Ahrens & McCarron could control the company and collect the debt owed to Ahrens & McCarron. In July, 1996, after receiving the results of the evaluation she had commissioned, Mrs. Ahrens terminated Mr. Zakibe's employment. Ahrens & McCarron did not pay Mr. Zakibe a bonus for 1995, which would have been due on April 1, 1996, a pro rata bonus for 1996, or severance pay. In August, 1996, after her husband's termination from Ahrens & McCarron, Mrs. Zakibe signed an American Showcase, Inc., Stockholder's Agree-

ment dated February 28, 1994 which reflected that she was a shareholder in American Showcase.

At the end of 1996, American Showcase owed Ahrens & McCarron $455,184. Ahrens & McCarron ultimately wrote off this amount as a bad debt expense because it was uncollectable. Ahrens & McCarron's board of directors did not authorize any of Mr. Zakibe's transactions with American Showcase.

## PROCEDURAL BACKGROUND

Mr. Zakibe (hereinafter plaintiff) filed a lawsuit against Ahrens & McCarron (hereinafter defendant) seeking damages for an alleged breach of employment contract that resulted from defendant's refusal to pay plaintiff, after he was terminated, an annual bonus for 1995 and a pro-rated bonus for 1996, severance pay, and miscellaneous items. Defendant asserted several affirmative defenses, including prior breach of contract and breach of fiduciary duty. Defendant also filed a counterclaim against plaintiff to recover damages for breach of fiduciary duty, breach of contract, and conspiracy. Defendant joined two additional parties, Mrs. Zakibe and Mr. Noble, and filed a claim against them for civil conspiracy to cause breach of fiduciary duties and breach of contract. Defendant later voluntarily dismissed its claims against Mr. Noble and the trial court granted a directed verdict in Mrs. Zakibe's favor.

The case was tried to a jury and was submitted on plaintiff's breach of contract claim and defendant's breach of fiduciary duty claim. The jury returned a verdict for defendant on plaintiff's claim for breach of contract. The jury also returned a verdict in defendant's favor on its counterclaim for breach of fiduciary duty and awarded defendant damages of $150,-000. Both parties appeal.

## DISCUSSION

### PLAINTIFF'S APPEAL

On appeal plaintiff raises five points of error. He challenges the affirmative de-

fense instructions submitting breach of contract and breach of fiduciary duty, the submissibility of defendant's counterclaim for breach of fiduciary duty, the verdictdirecting instruction submitting breach of fiduciary duty, and an instruction defining breach of fiduciary duty. For clarity, we will first address all of the points relating to breach of fiduciary duty and then address the instruction submitting the affirmative defense of breach of contract.

### I. Breach of Fiduciary Duty

A. *Submissibility of Defendant's Counterclaim for Damages for Breach of Fiduciary Duty*

Plaintiff contends that the trial court erred in denying his motion for directed verdict and his motion for judgment notwithstanding the verdict on defendant's counterclaim for breach of fiduciary duty. Plaintiff asserts that defendant failed to make a submissible case in that there was no evidence that plaintiff breached his fiduciary duty because there was no evidence that he secretly profited from the transaction. Plaintiff further argues that there was no evidence that his conduct directly caused any harm to defendant.

Defendant's breach of fiduciary duty claim was based on the contention that, while plaintiff was an officer and director of defendant, plaintiff and his wife had invested in American Showcase and, without defendant's authorization and in order to protect his investment, plaintiff had caused defendant to furnish goods on credit to American Showcase, causing defendant to be damaged. When breach of fiduciary duty is asserted as a tort claim, as here, the proponent must establish that a fiduciary duty existed between it and the defending party, that the defending party breached the duty, and that the breach caused the proponent to suffer harm. *Preferred Physicians Mutual Management Group v. Preferred Physicians Mutual Risk Retention*, 918 S.W.2d 805, 810 (Mo.App.1996).

■ In this case there is no question that by virtue of his position as an officer and a director plaintiff had a fiduciary duty to defendant. It is well-established that corporate officers and directors "occupy a fiduciary relation to the corporation and to the stockholders; [t]heir position is one of trust and they are bound to act with fidelity and subordinate their personal interest to the interest of the corporation should there be a conflict." *Hyde Park Amusement Co. v. Mogler*, 358 Mo. 336, 214 S.W.2d 541, 543 (1948); *see also Southwest Pump & Machinery Co. v. Forslund*, 225 Mo.App. 262, 29 S.W.2d 165, 169 (1930). An officer or director " 'occupies a position of the highest trust and confidence and the utmost good faith is required of him in the exercise of the powers conferred on him.' " *Bayne v. Jenkins*, 593 S.W.2d 519, 532 (Mo. banc 1980) (quoting *Gieselmann v. Stegeman*, 443 S.W.2d 127, 136 (Mo.1969)). An officer or director has a fiduciary duty to protect the corporation's interests. *Preferred Physicians Mutual Management Group*, 918 S.W.2d at 810. *See also* Charles Hansen and Don G. Lents, Missouri Corporation Law and Practice Section 4.5.a.2., 3. (3d ed.1999). Plaintiff challenges whether defendant made a submissible case on the remaining elements.

■ To make a submissible case, a party must present substantial evidence in support of each element of its claim. *Spring v. Kansas City Area Transp. Auth.*, 873 S.W.2d 224, 225 (Mo. banc 1994). To determine whether a party made a submissible case, we must view the evidence and reasonable inferences therefrom in the light most favorable to the party which obtained the verdict. *Id.* We disregard all of the opponent's evidence which contradicts the prevailing party's evidence, *Crabtree v. Bugby*, 967 S.W.2d 66, 70 (Mo. banc 1998), or does not support the prevailing party's case. *Hansome v. Northwestern Cooperage Co.*, 679 S.W.2d 273, 274 (Mo. banc 1984).

1. *Breach of Duty/Proof of Secret Profits*

Plaintiff contends that defendant failed to prove a breach of fiduciary duty because defendant did not show that plaintiff personally profited at defendant's expense. He argues that, because he eventually lost his $50,000 investment in American Showcase, he did not profit from the self-dealing, and therefore did not breach his fiduciary duty. Plaintiff bases his argument on the faulty premise that proof of profits is essential to establish a breach of fiduciary duty claim in tort.

■ Plaintiff relies on language contained in *Ramacciotti v. Joe Simpkins, Inc.*, 427 S.W.2d 425 (Mo.1968). That case sets out the rule for equitable relief for breach of fiduciary duty which is, if a corporate officer or director violates a fiduciary duty to the corporation and derives a personal, unconscionable and secret profit, that officer may be held to be a trustee of those profits for the benefit of the corporation and may be compelled to restore those profits to it. *Id.* at 431–32. *See also Ward v. Davidson*, 89 Mo. 445, 458, 1 S.W. 846, 850 (1886). In an equitable action to recover profits, once the corporation's transaction with a director, officer, or entity in which he or she has an interest has been established, the burden shifts to the officer or director who must show that he or she did not obtain secret profits and that the transaction was conducted fairly, honestly and openly. *Simpson v. Spellman*, 522 S.W.2d 615, 622 (Mo.App.1975). *See also Jackson v. St. Regis Apartments, Inc.*, 565 S.W.2d 178, 182 (Mo.App.1978).

■ However, fiduciary duties may be breached in a number of ways. *See* Hansen & Lents, *supra*, at Section 4.5.c. These do not necessarily turn on whether the officer obtained secret profits as a result of the breach. For example, in *Johnson v. Duensing*, 351 S.W.2d 27, 31 (Mo. banc 1961), the court found that directors breached their fiduciary duties by selling

corporate treasury stock at a reduced price to selected buyers in order to give a particular group control of the corporation.

■ Specifically, an officer or director may breach a fiduciary duty by engaging in undisclosed transactions with another company in which he has an interest which are not fair to the corporation. "[I]t is certain that, as a general proposition, neither the executive officers nor the directors of an incorporated company have a right to convert its assets to their own use, or give them away, or make any self-serving disposition of them against the interest of the company." *Emergency Patient Services, Inc. v. Crisp*, 602 S.W.2d 26, 28 (Mo.App.1980) (quoting *Jorndt v. Reuter Hub & Spoke Co.*, 112 Mo.App., 341, 87 S.W. 29, 30 (1905)).

■ While a breach of fiduciary duty gives rise to an action for an accounting if the fiduciary has profited from the breach, it also gives rise to non-equitable remedies, such as actions for damages for breach of contract or tort. *Missouri Highway & Transp. Comm'n. v. Sample*, 702 S.W.2d 535, 537 (Mo.App.1985) (quoting Restatement (Second) of Agency Section 403 cmt. b (1957)). If a corporation suffers losses to its corporate assets as a result of a director's or officer's breach of fiduciary duty, it can bring an action in tort to recover those damages. *Thompson v. Greeley*, 107 Mo. 577, 17 S.W. 962, 966 (1891); *Preferred Physicians Mutual Management Group*, 918 S.W.2d at 810–811; *Avis, Inc. v. Charmatz*, 208 F.Supp. 932, 934 (E.D.Mo.1962) (applying Massachusetts law, noting that it mirrors Missouri law). "[W]here directors waste or misappropriate the funds or convert assets of a corporation in violation of their trust or lose them, a recovery at law may be had against the defaulting directors." *State ex rel. Donnell v. Foster*, 225 Mo. 171, 125 S.W. 184, 194 (1909). An action for damages for breach of fiduciary duty does not depend on whether or not the officer or director realized a monetary profit.

■ Defendant was not required to show that plaintiff profited by his extension of credit to American Showcase in order to make a submissible case of breach of fiduciary duty.

2. *Evidence of Harm Caused by Plaintiff's Misconduct*

■ Plaintiff next asserts that there was no substantial evidence that defendant was harmed as a result of plaintiff's action in furnishing goods on credit to American Showcase. We disagree.

There was substantial evidence that defendant was harmed by plaintiff's allowing American Showcase unlimited credit in violation of defendant's written credit policy which prohibited allowing more than $25,000 credit to any customer. The action resulted in the creation of a large receivable which varied in magnitude but was $383,322 at the end of 1995 and $455,184 at the end of 1996. American Showcase never repaid the $455,184 and defendant ultimately wrote off this amount as a bad debt expense because it was uncollectable. Further, defendant also had to bear the cost of carrying this receivable, which its comptroller testified was about $50,000 per year and which caused defendant to experience serious cash flow problems.

B. *Submission of Verdict–Directing Instruction on Defendant's Breach of Fiduciary Duty Claim*

Plaintiff contends the trial court erred in giving verdict-directing Instruction No. 13 on Ahrens & McCarron' counterclaim for breach of fiduciary duty because it did not present an actionable claim. We disagree.

The trial court gave the following verdict-directing Instruction No. 13 to the jury on defendant's counterclaim for breach of fiduciary duty:

On Ahrens & McCarron's claim against Thomas Zakibe for breach of his fiduciary duties to Ahrens & McCarron, your verdict must be for Ahrens & McCarron and against Thomas Zakibe if you believe:

First, Thomas Zakibe invested his and his wife's personal funds in American Showcase, and

Second, after such investment and while an officer and director of Ahrens & McCarron, Thomas Zakibe, without authorization from Ahrens & McCarron, caused Ahrens & McCarron to furnish goods to American Showcase on credit, and

Third, Thomas Zakibe caused Ahrens & McCarron to furnish such goods to American Showcase on credit in order to protect his and his wife's investment in American Showcase and not to further the business interests of Ahrens & McCarron, and

Fourth, that as a direct result of such conduct of Thomas Zakibe, Ahrens & McCarron was damaged.

Defendant argues that his furnishing of goods to American Showcase on credit without authorization did not constitute a breach of fiduciary duty because 1) the instruction did not require the jury to find that plaintiff profited from his actions and 2) there was no evidence that authorization was required.

We have already rejected plaintiff's argument that a claim for breach of fiduciary duty is dependent on the officer's receipt of a secret profit. We likewise reject plaintiff's claim that defendant failed to make a submissible case because it did not adduce evidence that authorization was required. It did not need to adduce such evidence because authorization in this situation is required as a matter of law to take the transaction out of the impermissible realm of self-dealing. It has long been established that, if a corporation contracts with or engages in a transaction with an officer or director, or an entity in which the officer or director has an office or financial interest, in order to avoid the conflict of interest otherwise created by self-dealing, that officer or director must disclose all material facts relating to that relationship or interest and to the transaction. Further, such transactions must be authorized by the disinterested directors or, in certain situations, by shareholders, who have received full disclosure. *Frankford Exchange Bank v. McCune*, 72 S.W.2d 155, 158 (Mo.App.1934) and cases cited therein; *In re Material Engineering Assoc. Ltd.*, 168 B.R. 204, 208–09 (U.S.B.C.W.D.Mo.1994) (applying Missouri law). This concept is codified in Section 351.327 RSMo (Cum.Supp.1998), in the context of void and voidable transactions.

C. *Instruction Submitting Affirmative Defense of Breach of Fiduciary Duty*

Plaintiff asserts that the trial court erred in giving Instruction No. 10, which submitted the affirmative defense of breach of fiduciary duty, for three reasons. He argues that breach of a fiduciary duty is not a defense to a breach of contract claim, the conduct posited did not constitute a breach of fiduciary duty, and the instruction was not supported by sufficient evidence.

As an affirmative defense to plaintiff's breach of employment contract claim, defendant alleged that, before it terminated plaintiff, plaintiff had breached his fiduciary duty as set out in its counterclaim and third-party petition and defendant was thereby excused from performing any obligations under the employment contract.

Instruction No. 10 submitted the affirmative defense of breach of fiduciary duty to the jury in the following language:

On [plaintiff's] claim against [defendant] for breach of his employment contract, your verdict must be for [defendant] and against [plaintiff] if you believe:

First, [plaintiff] invested his and his wife's personal funds in American Showcase, and

Second, after such investment and while an officer and director of [defendant], [plaintiff]:

(a) failed to disclose to [defendant] his financial interest in American Showcase, or

(b) without authorization from [defendant], caused [defendant] to furnish goods to American Showcase on credit, or

(c) without authorization from [defendant], caused [defendant] to furnish various goods to American Showcase at [defendant's] cost and for no profit to [defendant], and

Third, [plaintiff] engaged in the conduct described in any of paragraphs (a) through (c) in order to protect his and his wife's investment in American Showcase and not to further the business interests of [defendant].

### 1. Breach of Fiduciary Duty as a Defense to a Contract Claim

Plaintiff first contends that the trial court's submission of Instruction No. 10 to the jury was error because breach of fiduciary duty is not a defense to a breach of contract claim in Missouri. Plaintiff argues that a tort claim which does not challenge the validity of a contract cannot serve as a defense to a claim for breach of the contract.

■ In this case plaintiff, a corporate officer and director, sought to recover two types of compensation under his employment contract, bonuses and severance pay. However, he was subject to the rule that a corporate officer forfeits all rights to compensation which might otherwise be due when the officer engages in activities that breach the officer's fiduciary duty of loyalty to the corporation. 5A FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, Section 2145, pp. 166–67 (1995 Perm. Ed.); *Ranch Hand Foods, Inc. v. Polar Pak Foods, Inc.*, 690 S.W.2d 437, 448 (Mo.App.1985) (applying Kansas law); *Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320, 327 (1983); *Toy v. Lapeer Farmers Mut. Fire Ins. Ass'n*, 297 Mich. 188, 297 N.W. 230, 232 (1941); *Venie v. Harriet State Bank of Minneapolis*, 146 Minn. 142, 145, 178 N.W. 170, 171 (1920); *American Timber & Trading Co. v. Niedermeyer*, 276 Or. 1135, 1153 558 P.2d 1211, 1222 (1976); *Wilshire Oil Company of Texas v. Riffe,* 406 F.2d 1061, 1062 (10th Cir.1969); *Flint River Pecan Co. v. Fry*, 29 F.2d 457, 459 (5th Cir.1928); *Kassab v. Ragnar Benson, Inc.*, 254 F.Supp. 830, 833 (W.D.Pa.1966); *Backus v. Finkelstein*, 23 F.2d 357, 361 (D.Minn.1927); *T.A. Pelsue Co. v. Grand Enterprises, Inc.*, 782 F.Supp. 1476, 1487 (D.Colo.1991).

■ This rule has its source in agency law. The corporate officer or director's fiduciary duty to the corporation is governed by the same rules that apply to trustees and agents. *Bent v. Priest*, 86 Mo. 475, 482 (1885). An agent who breaches a fiduciary duty likewise forfeits any right to compensation. *Wadsworth v. Adams*, 138 U.S. 380, 388, 11 S.Ct. 303, 306, 34 L.Ed. 984 (1891); *Harrison v. Craven*, 188 Mo. 590, 87 S.W. 962, 967 (1905); *Morgan v. Aldrich*, 114 Mo.App. 700, 91 S.W. 1024, 1027 (1905); *Murray v. Beard*, 102 N.Y. 505, 508, 7 N.E. 553 (1886). Breach of fiduciary duty also constitutes a defense to an action by the agent against the principal for compensation for services. *Wadsworth*, 138 U.S. at 387–89, 11 S.Ct. 303 (contract action); *Munro v. Smith*, 259 F. 1, 22 (1st Cir.1919); RESTATEMENT (SECOND) OF AGENCY Section 469. Because of the fiduciary relationship, fiduciary principles modify any contract between the parties. This allows the breach of fiduciary duty to give rise to claims in tort, as well as contract, and to be pleaded as a defense to a contractual claim for compensation. RESTATEMENT (SECOND) OF AGENCY *Introductory Note* to Chapter 13, Topic 1. at 171. An agent's claim for compensation accruing after the beginning of the agent's wrongdoing is not valid or enforceable and the agent's breach of fiduciary duty is a defense to an action for compensation. *Munro*, 259 F. at 22; *Raymond v. Davies*, 293 Mass. 117, 199 N.E. 321, 323 (1936).

■ These rules of law apply equally to breaches of fiduciary duty by corporate officers and directors. *See Wilshire Oil*, 406 F.2d at 1062 (applying RESTATEMENT (SECOND) OF AGENCY Section 469 to

the conduct of a corporate officer). Regardless of contract terms, a corporate officer forfeits all rights to compensation, including his or her entitlement to bonuses, if that officer breaches his or her fiduciary duty to the corporation. *Ranch Hand*, 690 S.W.2d at 448 (applying a Kansas agency case); *Veco Corp. v. Babcock*, 243 Ill.App.3d 153, 165, 183 Ill.Dec. 406, 611 N.E.2d 1054, 1062 (1993). A corporate officer's breach of fiduciary duty is a defense to the officer's claim for salary and fees. *Toy*, 297 N.W. at 232.

■■■ Here, plaintiff was a corporate officer and director of defendant. The jury found that plaintiff breached his fiduciary duty to defendant. As a result of his breach of fiduciary duty, plaintiff forfeited his rights to all compensation, including bonuses and severance pay, to which he may have been entitled under the contract after he began his wrongdoing. The trial court did not err in submitting breach of fiduciary duty as a defense to his claim for bonuses and severance pay under his contract.

### 2. *Conduct Constituting a Breach of Fiduciary Duty*

Plaintiff next asserts that the trial court erred in submitting Instruction No. 10 because the conduct posited by the instruction does not rise to the level of a breach of fiduciary duty. He first asserts that the instruction was defective because it failed to require the jury to find that plaintiff obtained secret profits. We have already rejected the faulty assumption that secret profits are required to establish a breach of fiduciary duty.

Plaintiff next asserts that neither of the subparagraphs of paragraph "second" was legally sufficient. He challenges subparagraph (a) because it assumed that plaintiff's financial interest in American Showcase conflicted with the interests of defendant, when there was evidence that the two businesses were complementary and not competing. He further argues that, in this situation, a failure to disclose that interest could not constitute a

breach of fiduciary duty. This argument is also based on an invalid premise. The question is not whether defendant competed with American Showcase or had antagonistic interests to American Showcase or otherwise conflicted with American Showcase. The relevant issue is that defendant did business with American Showcase. As we have already set out in Section I. B., *supra*, because plaintiff was an officer and director of defendant and also had a financial interest in American Showcase and because defendant did business with American Showcase, plaintiff had a duty to disclose his financial interest in American Showcase to avoid the conflict of interest that would otherwise result from such self-dealing.

Plaintiff also challenges subparagraphs (b) and (c) of paragraph "second" because those paragraphs assumed that he was required to seek authorization before he could extend credit from defendant to American Showcase. Again, as we have already discussed in Section I. B., *supra*, to avoid the conflict of interest otherwise created by self-dealing in this situation, as a matter of law plaintiff had to disclose the material facts about his interest in American Showcase and the transaction had to be authorized by directors or shareholders of Ahrens & McCarron with full knowledge.

### 3. *Evidentiary Support*

Plaintiff last contends that the trial court erred in submitting Instruction 10 to the jury because it was not supported by the evidence. He argues that there was no evidence that he failed to disclose his financial interest in American Showcase to defendant and no evidence that he acted improperly, without authorization, in causing defendant to furnish goods at cost or credit to American Showcase. At trial, his objection to this instruction was based only on the failure of the evidence to show that he was required to seek authorization to extend the credit or furnish goods at cost. On review we are limited to the issue

raised by that objection. *Seidel v. Gordon A. Gundaker Real Estate Co.*, 904 S.W.2d 357, 364 (Mo.App.1995). As we have previously set out in Section I. B., *supra,* no evidence of a requirement of authorization was necessary.

D. *Instruction 6, Breach of Fiduciary Duty Definition*

Plaintiff maintains that the trial court erred in submitting Instruction No. 6 because it gave the jury a roving commission in that it submitted an abstract legal proposition. Instruction 6 was offered and accepted as a definition of breach of fiduciary duty, a term used in Instruction 16. It provided:

> You are instructed that as an officer and director of [defendant], plaintiff owed a fiduciary duty to [defendant]. As a fiduciary, [plaintiff] was obligated to disclose all material facts to [defendant], strictly avoid misrepresentation and act in all respects with the utmost good faith towards [defendant].

The instructions provided that Instruction 6 applied to plaintiff's claim and to defendant's counterclaim. Plaintiff objected on the following grounds:

> We object to Instruction No. 6, proposed instruction, definition of breach of fiduciary duty. We don't believe it in any way relates to the claims in this case. We don't believe that it is, it's supported by the evidence or the claims in this case, and improper instruction, and confusing to the jury.

The court overruled the objection. Plaintiff then supplemented his objection by adding that "the proffered definition does not properly instruct on the law as to the duties of an officer and director of a corporation" and "[i]t does not specifically posit the self – any self-dealing or secretive priorities, or anything of that nature, which constitutes a breach of fiduciary duty based on the facts of this case."

 Rule 70.03 provides that "[n]o party may assign as error the giving or failure to give instructions unless that par-

ty objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Further, a point on appeal must be based upon the theory voiced in the objection at trial and a defendant cannot expand or change on appeal the objection as made. *State v. Flenoid*, 838 S.W.2d 462, 466 (Mo.App.1992). Plaintiff objected to Instruction No. 6 on various grounds but not on the ground raised on appeal, that the instruction was erroneous because it gave the jury a roving commission in that it submitted an abstract legal proposition. Plaintiff has accordingly not preserved this error for review. *See Emery v. Wal–Mart Stores, Inc.*, 976 S.W.2d 439, 445 (Mo. banc 1998).

 We have examined the instruction for plain error and find none. The instruction was an unnecessary abstract statement of law. If a proper and timely objection had been made, we would examine it to determine its prejudicial effect. Rule 70.02(c) Mo. R. Civ. P. We find no prejudice, much less plain error. This instruction did not give the jury a roving commission whereby it could return a verdict based on anything other than the evidence in the case. It did not purport to direct a verdict, it was a correct statement of two of the underlying legal principles on which Instructions 10 and 13 were based, and it was not misleading. The precise facts which the jury had to find for liability on the counterclaim and as a defense to the petition were set out in the verdict director and the affirmative defense instructions submitting breach of fiduciary duty. *Bartlett v. Hume–Sinclair Coal Mining Co.*, 351 S.W.2d 214, 218 (Mo.App.1961).

II. *Breach of Contract—Instruction Submitting Affirmative Defense of Breach of Contract*

Plaintiff contends that the trial court erred in giving Instruction No. 9, which submitted defendant's affirmative defense of plaintiff's own breach of contract on plaintiff's claim for damages for defen-

dant's breach of contract. Plaintiff asserts that the instruction was prejudicially vague and gave the jury a roving commission, the instruction was not supported by the evidence, and the contract provisions which were the basis of plaintiff's claim were severable from the provisions that the instruction posited were breached. We do not need to reach this issue.

■ Factual issues necessarily determined by a jury's verdict on one claim in a case are also deemed resolved with respect to other claims in the same case. *Brewer v. Rowe*, 363 Mo. 592, 252 S.W.2d 372, 375 (banc 1952); *Southwestern Bell Telephone Co. v. Buie*, 788 S.W.2d 346, 348–49 (Mo. App.1990). The judgment in defendant's favor on its counterclaim was based on an instruction which advised the jury of the acts which would constitute a breach of fiduciary duty. To find for defendant on the counterclaim, the jury necessarily found a) that plaintiff invested his and his wife's personal funds in American Showcase, b) after such investment and while an officer and director of defendant, plaintiff, without authorization from defendant, caused defendant to furnish goods to American Showcase on credit, and c) plaintiff caused defendant to furnish such goods to American Showcase on credit in order to protect his and his wife's investment in American Showcase and not to further the business interests of defendant.

Because these same factual findings also required a verdict in defendant's favor on the affirmative defense of breach of fiduciary duty on plaintiff's breach of contract claim, we must conclude that the jury based its defendant's verdict on plaintiff's petition on the affirmative defense of breach of fiduciary duty. Because, as we have held, breach of fiduciary duty is a defense to plaintiff's claim and was properly submitted and because the facts establishing the defense were necessarily found by the jury, we do not need to reach the question of whether another defense, breach of contract, was also properly submitted.

## DEFENDANT'S APPEAL

■ For its sole point on cross-appeal, defendant asserts that the trial court erred in directing a verdict against it on its conspiracy claim against Mrs. Zakibe because its evidence more than satisfied its burden of making a submissible case of conspiracy against her. Plaintiff responds that defendant's point relied on does not comply with the requirements of 84.04(d). Plaintiff's response is well-taken. Defendant's point relied on reads as follows:

Ahrens & McCarron's evidence more than satisfied its burden of making a submissible case of conspiracy against Barbara Zakibe, and the trial court, therefore, erred in directing a verdict against Ahrens & McCarron on its conspiracy claim.

Rule 84.04(d) requires that a point relied on contain the following three components: (1) a concise statement of the challenged ruling of the trial court, (2) the rule of law which the trial court should have applied, and (3) the evidentiary basis upon which the asserted rule is applicable. *Jefferson v. Bick*, 872 S.W.2d 115, 118 (Mo.App. 1994). This rule directs that the point relied on substantially follow the following form:

The trial court erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*].

Rule 84.04(d). The requirements of Rule 84.04(d) are mandatory. *Jefferson*, 872 S.W.2d at 118. Merely stating in a brief on appeal what the alleged errors are, without stating why they are errors, does not satisfy Rule 84.04(d) and does not preserve the question for review. *Id.*

■ This point does not follow the required format and substantively does not comply with Rule 84.04(d) because it fails

to specify 'wherein and why' the trial court erred in ruling on the motion. *McCutcheon v. Cape Mobile Home Mart*, 796 S.W.2d 901, 907 (Mo.App.1990). Rather, the explanation is conclusory and fails to set out what rule of law the court should have applied and the evidentiary basis for it. The point fails to summarize the evidence that supports defendant's claim that it made a submissible case. *See First Bank Centre v. Thompson*, 906 S.W.2d 849, 852 (Mo.App.1995).

 Because defendant's point does not conform to Rule 84.04(d), our review is limited to plain error. *Id.* We have examined defendant's argument under this point and find no basis for plain error review because the argument fails to set out the legal basis of defendant's conspiracy claim or show how the evidence supports a submissible case of conspiracy under the applicable law. Without the required analysis, the argument is not reviewable. "If party fails to support a contention ... with argument beyond conclusions, the point is considered abandoned." *Coleman v. Gilyard*, 969 S.W.2d 271, 274 (Mo.App.1998). *See also Estate of Dean v. Morris*, 963 S.W.2d 461, 466 (Mo.App.1998). This omission is not cured by the discussion in the reply brief. *Knopke v. Knopke*, 837 S.W.2d 907, 923 (Mo.App.1992).

## CONCLUSION

The judgment of the trial court is affirmed.

ROBERT G. DOWD, Jr., J. and SHERRI B. SULLIVAN, J. concur.